**CABINET FOR HUMAN RESOURCES, COMMONWEALTH OF KENTUCKY, Plaintiff–Appellant,**

v.

**NORTHERN KENTUCKY WELFARE RIGHTS ASSOCIATION, Defendant–Appellee.**

No. 91–5122.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 20, 1991.

Decided Jan. 24, 1992.

Order on Denial of Rehearing and Suggestion for Rehearing En Banc March 30, 1992.

Maria T. Geisler (argued & briefed), Cabinet for Human Resources, Com. of Ky., Sandra E. Downs (briefed), Frankfort, Ky., for plaintiff-appellant.

Carl J. Melcher (argued), Northern Kentucky Legal Aid Soc., Inc., Covington, Ky., Anthony G. Martin (briefed), Kentucky Legal Services Program, Lexington, Ky., for Northern Kentucky Welfare Rights Assn., Diane Mills and Salina Murdock.

Before MERRITT, Chief Judge, KENNEDY, Circuit Judge, and McRAE, Senior District Judge.[*]

MERRITT, Chief Judge.

This case raises questions concerning the availability of federal judicial review for claims under the Low Income Home Energy Assistance Act of 1981, 42 U.S.C. §§ 8621–8629. The Act authorizes a program of federal-state block grants to assist eligible households in meeting the costs of home energy and requires a set of state administrative remedies for aggrieved tenants.[1] The Commonwealth of Kentucky

---

[*] The Honorable Robert M. McRae, Senior District Judge for the United States District Court for the Western District of Tennessee, sitting by designation.

1. The state must "provide an opportunity for a fair administrative hearing to individuals whose claims for assistance ... are denied...." 42 U.S.C. § 8624(b)(13).

applied for and received funds through the program and established a scheme of administrative relief. Kentucky adopted the "Model Plan" offered by the federal Department of Health and Human Services for distributing the energy subsidies and designated the state Cabinet for Human Resources as the agency to implement the Plan.

Anticipating a legal challenge to its method of calculating an eligible household's subsidy level under the Act, the Cabinet filed suit in District Court seeking declaratory relief that the Kentucky Plan conformed to the requirements of the Act. The complaint named as defendant the Secretary of Health and Human Services, Dr. Louis W. Sullivan. The Northern Kentucky Welfare Association ("the Association") entered the suit on the side of the defendant. Under the Kentucky Plan, the Association claimed, the Commonwealth unlawfully discriminated against tenants of publicly subsidized housing when calculating a household's subsidy level. The Association did not seek to exhaust state administrative remedies, but filed a class counterclaim seeking declaratory and injunctive relief. The federal defendant was dismissed from the action leaving only the Cabinet as plaintiff and the Association as defendant and counter claimant.

The District Court granted declaratory relief in favor of the Association and enjoined the Cabinet from using the amount of energy costs allowed tenants in public housing as a factor in calculating the amount of benefits allocated to eligible families. We now dissolve the injunction and dismiss this action because we find that the Act implies no private right of action prior to exhausting state administrative remedies and that the Act creates no independent rights enforceable in federal court under 42 U.S.C. § 1983.

## I.

The Low Income Home Energy Assistance Program created by the Act is a voluntary federal-state grant program. The Act authorizes the Secretary of HHS to grant funds to states to assist low income households in meeting the costs of home energy, but does not create an entitlement program. States receive a lump sum to be distributed to eligible households. Unlike entitlement programs, once that sum is depleted no more subsidies will be awarded regardless of an applicant's eligibility or need.

To receive program funds, a state must submit to the Secretary an application that contains a plan detailing the manner in which the state will distribute grant funds. 42 U.S.C. § 8624(c)(1). The language of the Act does not use the customary "shall" language of entitlement laws that is generally recognized to mandate certain behavior. Instead, the Act requires a state applicant to give "assurances," § 8624(a), or to "certify," § 8624(b), that it will use its allotted funds for purposes specified. The Act also requires the Secretary to make a model state plan format available to the states that each state may use to prepare its application. § 8624(c)(3). The states must conduct public hearings with respect to their proposed distribution of funds, § 8624(a)(2), and also make each plan and any substantial revisions available to the public for inspection and comment. § 8624(c)(2).

The Act's directives for state administration of the subsidy program are general in nature. The Act establishes an eligibility scheme in terms of household income levels. Participating states are to distribute funds to eligible households so that the highest level of assistance is given to households with the lowest incomes and the highest costs in relation to income. § 8624(b)(5). The Act does not prescribe a method of calculating actual benefits, but to receive funds a state must assure the Secretary that it will not distinguish between those households already receiving other public welfare benefits and those low income households that do not receive other benefits. § 8624(b)(8). The Act also states that subsidies received through the grant program should not be considered income or resources of the recipient for any purpose under state or federal law. § 8624(f)(1).

The language in the Act, though not conclusive, indicates that Congress intended to minimize federal involvement in the administration of the subsidy program. For example, § 8624(b) states that the "Secretary [of HHS] may not prescribe the manner in which the States will comply" with the central, substantive provisions of the Act. Although conditions attach to the receipt of grant funds and the Secretary must approve the initial disbursement of grant funds to qualifying states, the Act

envisions a very limited federal role in the actual distribution of the funds to eligible recipients.

This general overriding proposition of limited federal involvement is an important feature of the energy subsidy program. It is against this backdrop that we must evaluate the role Congress intended for the federal courts in enforcing a state's compliance with the conditions set forth in the Act.

The dispute in the present case concerns Kentucky's method of calculating a household's energy costs in order to determine its subsidy level. The Association claims that the calculation of individual benefits under the Cabinet's Plan violates certain provisions of the Act. The Association represents members who are residents of subsidized public housing. The two individually named claimants, Diane Mills and Salina Murdock, are members of the Association's leadership committee. In its class action challenge to the Cabinet's administration of the energy subsidy program, the Association claims that Kentucky's method for calculating benefit levels unlawfully uses the amount of energy costs allowed tenants in public housing, fails to treat owners and renters equitably, and does not provide the highest benefits to applicants with the lowest incomes and highest costs in relation to income.

The District Court determined that by considering these other energy subsidies, the Cabinet violated § 8624(f)(1), which states that home energy assistance payments or allowances under the Act should not be considered income or resources of the household for any purpose under federal or state law. The District Court accepted the Association's argument that the state may not reduce energy payments under the Act when the claimant is also receiving an energy subsidy as a part of the claimant's monthly public housing assistance. Finding this issue to be dispositive, the Court did not rule on the Association's other claims.

The District Court relied on the Eighth Circuit's decision in *Clifford v. Janklow*, 733 F.2d 534 (8th Cir.1984). In *Clifford*, the Court found that § 8624(f)(1) [2] "clearly prohibits the states from reducing a household's entitlement to other forms of public assistance based on its receipt of [federal funds under the energy subsidy program]"

and that it also "evinces Congress's intent to prevent the states from achieving the same net effect by the opposite method, ... reducing the [federal energy subsidy] grant based on the applicant's receipt of other forms of public assistance." *Id.* at 537.

The Cabinet argues that the District Court's holding was inappropriate because no private right of action is implied in the Act and because the Act creates no substantive rights enforceable under 42 U.S.C. § 1983. The Association asserts that its members do have an implied private right of action under the Act and asserts that the Act creates substantive rights in eligible recipients that are enforceable under § 1983. The District Court's order does not discuss the basis for finding that the Association has a private right of action against the Cabinet, but proceeds directly to the merits of the case. We presume that the Court adopted by reference the conclusion of the Eighth Circuit in *Crawford v. Janklow*, 733 F.2d 541 (8th Cir. 1984), a predecessor to *Clifford* in which the Court found support for implying a private right of action under the Act and for the existence of rights enforceable under § 1983. We are unpersuaded by the Eighth Circuit's reasoning in *Crawford*. We disagree that the Act authorizes a private right of action prior to exhausting state administrative remedies. We also disagree that the Act creates rights enforceable under § 1983. We thus find it unnecessary to reach the merits of the question as to whether Kentucky's method of distributing federal funds under the Plan violates the Act.

## II.

The Act does not expressly provide for a private right of action. Claimants may state a federal claim only if they have an implied private right of action under the Act or if they have a cause of action under 42 U.S.C. § 1983.

## A.

 When determining whether there is an implied right of action under a federal statute, congressional intent is of primary importance. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622–

2. Formerly § 8624(f).

23, 69 L.Ed.2d 435 (1981); *Withworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 794 F.2d 221, 228 (6th Cir.1986). In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set forth a series of standards to determine whether a private remedy is implicit in a federal statute even when Congress did not expressly provide for one:

(1) Is the plaintiff one of the class for whose special benefit the statute was enacted?

(2) Did Congress indicate any intent either to create or deny a remedy?

(3) Would implying a remedy for the plaintiff be consistent with the underlying purpose of the legislative scheme?

(4) Would the cause of action be one traditionally delegated to state law such that it would be inappropriate to imply a federal remedy?

Courts routinely have applied these standards to establish the existence of an implied right of action. As this Court noted in *Withworth*, however, the purpose of the inquiry is merely to discern legislative intent. *Withworth*, 794 F.2d at 229. Applying the *Cort* test to the statute at issue, we perceive no indication that Congress intended to create a private remedy for beneficiaries under the Act.

First, although we agree with the Association that its members are among those whom Congress intended the Act to benefit, to satisfy the first prong of the *Cort* test we must also find that Congress "intended to confer federal rights upon these beneficiaries." *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779–80, 68 L.Ed.2d 101 (1981). The Court in *Sierra Club* further instructs us that we should first look to the language of the Act to ascertain this intent. *Id.*

The Act places responsibility for administration of the energy subsidy program almost entirely in the hands of the state. Despite the general directives contained in the statute, it confers upon the state great latitude in developing a distribution scheme. For example, the Act instructs participating states only to set aside "a reasonable amount" of grant funds for energy crisis intervention. § 8623(c). Conceivably, the state could set aside its entire allotment for crisis intervention and not offer general subsidies in any form. As mentioned previously, the Act does not create an entitlement program; a state may exhaust its funds before some of its neediest families receive any benefit at all, yet this clearly would not constitute a violation of the statute. The Act also specifically limits the degree to which the Secretary can dictate the method by which a state must comply with the Act. § 8624(b). Finally, the remedial scheme envisioned by the statute focuses on state administrative remedies. § 8624(b)(13). These characteristics of the home energy assistance program are inconsistent with a finding that Congress intended to confer an enforceable federal right on potential beneficiaries.

Second, we find that Congress did not intend to create a federal cause of action, but instead intended for the states to establish state administrative remedies allowing tenants to contest errors in the calculation of their benefits. Although the statute is ambiguous on this point, an examination of the limited remedial scheme found in the Act supports our conclusion. Congress expressly provided for three types of relief for aggrieved claimants: (1) claimants may complain directly to the Secretary who *must* investigate all complaints of a substantial or serious nature and withhold funds if a state has failed to use funds in a manner consistent with the requirements of the Act, § 8627; (2) if the secretary determines that a state has violated the nondiscrimination provisions of the Act, he may refer the matter to the Attorney General and recommend that a civil suit be instituted, § 8625; and (3) an aggrieved claimant must be provided by the state with "a fair administrative hearing" when the claim is denied or not acted on promptly, § 8624(b)(13). Pursuant to the requirement that a participating state provide an administrative forum, Kentucky claimants have the right to request and receive "a fair administrative hearing" for claims under the Act, 904 Ky.Admin.Regs. 2:116 § 6, and to seek judicial review under the commonwealth's administrative process, 904 Ky.Admin.Regs. 2:055. The claimants here have not sought to exhaust these remedies.

Although claimants may channel complaints through the Secretary, the statute expressly provides for legal action to be initiated by a beneficiary only through a state administrative action. The two purely federal remedies provided in the Act do not purport to give a claimant standing to

sue in federal court or provide federal jurisdiction to review benefits, hear class actions, or award declaratory relief on behalf of claimants.

We disagree with the Association that a private right of action in federal court is necessary to complete the scheme of equitable distribution of energy subsidies envisioned by this statute. Congress did leave an avenue for private enforcement, but it did so through state administrative action and not through the federal courts in the form of an original action. "When [a] statute specifically provides certain remedies the courts should not expand the statute to encompass other remedies." *Withworth*, 794 F.2d at 230 (citing *Cort*). The claimants here have not exhausted the avenues for administrative relief and until they do, we find it unnecessary to complete the inquiry as to whether a private right of action is implied in the Act.

In *Crocker v. Tenn. Secondary School Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989), we discussed the rationale for requiring plaintiffs to exhaust administrative remedies before bringing a case under the Education of the Handicapped Act, 20 U.S.C. § 1415(e), in federal court:

> The policies underlying this exhaustion requirement are both sound and important. States are given the power to place themselves in compliance with the law, and the incentive to develop a regular system for fairly resolving conflicts under the Act. Federal courts—generalists with no expertise in the educational needs of handicapped students—are given the benefit of expert factfinding by a state agency devoted to this very purpose.... Were federal courts to set themselves up as the initial arbiters of handicapped children's educational needs before the administrative process is used, they would endanger not only the procedural but also the substantive purpose of the Act. And both states and the federal government have a recognized interest in providing enforcement of the Act that is not only just but efficient. (citations omitted).

We find this reasoning equally persuasive in the present case.

The substance of the complaint in this case requires review of the actual calculations made by the agency administering the energy subsidy program. Although the amounts at issue cumulatively may be great, by asking us to imply a right of action, the claimants are asking us to confirm the right of individuals who may benefit under the Act to file claims in federal court for disputes over very small amounts arrived at through detailed, highly localized procedures. We find no strong federal interest in what amounts to adjudicating monthly energy bills. We can think of no welfare benefits program where beneficiaries can sue directly in federal court without first engaging the administrative process. If we are to consider claims under the Act at all, we hesitate to do so without the benefit of an administrative record. Thus we find that the Act does not satisfy the second prong of the *Cort* test. Despite any ambiguity in the statute as to the intent of Congress to create or deny a remedy, we find the argument that Congress intended to create only a limited avenue for relief more persuasive than the assertion that claimants should be able to bring highly localized disputes over small sums into federal court.

Third, we find that implying an original federal remedy for the plaintiff would be inconsistent with the legislative scheme of the home energy grant program. We disagree with the Association that a private right of action in federal court is necessary to complete the scheme of equitable distribution of energy subsidies envisioned by the Act. Limiting the avenues for relief to state forums is consistent with the overall structure of the energy subsidy program as described above. It is important to remember that Congress drafted the statute against a background of minimal federal involvement. The Act as a whole suggests that Congress erected the framework for a relatively autonomous, state-administered, nonentitlement subsidy program. Congress restricted federal participation, but retained limited federal oversight. Thus, while the Secretary may not casually interfere with a state's administration of the program, states must work within the statutory framework or lose the right to participate.

In sum we hold that claimants have no implied original right of action under the Act. The fourth factor of the *Cort* test is not at issue because the complaint arises under a federal act and thus is not an area traditionally left to the states.

## B.

■ Violations of rights, privileges, or immunities secured by federal statutory law as well as constitutional law are actionable under 42 U.S.C. § 1983. *Maine v.*

*Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). There are two limitations, however, to the broad application of § 1983 to alleged violations of federal statutes. First, Congress must not have foreclosed private enforcement in the enactment of the statute itself, and second, the statute must create substantive, enforceable rights. *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981).

■ The Supreme Court has held that Congress forecloses private enforcement under § 1983 if the statute at issue creates a comprehensive enforcement scheme. *Middlesex County Sewerage Authority v. Nat'l Sea Clammers,* 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1983). Courts have compared the inquiry as to whether a statute creates substantive, enforceable rights to the analysis under *Cort v. Ash* for the existence of an implied cause of action. *See, e.g., Crawford v. Janklow,* 710 F.2d 1321, 1326 (8th Cir.1983); *Boles v. Earl,* 601 F.Supp. 737, 742 (W.D.Wisc. 1985). Although the Association argues that the enforcement scheme set forth in the statute is not sufficiently elaborate to find that Congress foreclosed private enforcement in the enactment of the statute itself, we disagree with their assessment of the administrative relief available under the Act. As we have pointed out above, it appears that Congress intended that claimants exhaust a set of state administrative remedies before any attempt to seek federal judicial remedies.

We also agree with the Fourth Circuit in *Hunt v. Robeson County Dep't of Social Services,* 816 F.2d 150, 152 (4th Cir.1987), that the Act does not create substantive rights so as to give the claimants a cause of action under § 1983. In *Hunt,* the Fourth Circuit characterized the Act as "a mere federal-state funding statute, which gives actual assistance to the States and only indirect benefits to qualified households." *Id.* at 153 (footnote omitted). Relying on the Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Court found that the language of the Act is too indefinite to create enforceable rights in eligible recipients of the funds. *Hunt,* 816 F.2d at 153. Therefore, the Court concluded, the Act is not enforceable under § 1983.

In contrast to *Hunt,* the Eighth Circuit, also citing *Pennhurst* for authority, held

that the Act does create substantive rights enforceable by qualified recipients under § 1983. *Crawford v. Janklow,* 710 F.2d 1321 (8th Cir.1983). The Eighth Circuit also found that the remedial scheme set forth in the Act is inadequate to protect the interests of targeted beneficiaries and, as such, is not an exclusive remedy that should foreclose enforcement of the Act under § 1983. *See also Boles v. Earl,* 601 F.Supp. 737 (W.D.Wisc.1985) (following *Crawford* in holding that plaintiffs have a cause of action under § 1983 for alleged violations under the Act).

As noted, the Courts in each of these cases relied on the Supreme Court's decision in *Pennhurst* as authority for their holdings. In *Pennhurst* the Court held that the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act ("Disabled Assistance Act") did not create substantive rights in favor of the mentally retarded that are enforceable under § 1983. The Court found important to its evaluation the fact that the program created under the Disabled Assistance Act was a voluntary federal-state cooperative program and that states could choose between complying with the conditions set forth in the Act or foregoing the benefits of federal funding. The Court found support in the language of the Disabled Assistance Act, including a statement that the purpose of the Act was "to *assist* the states to assure that persons with developmental disabilities receive [appropriate care]" and language preceding the bill of rights stating that each state shall as a condition of receiving assistance "provide the Secretary satisfactory *assurances*" that certain steps would be taken to protect the interests of the state's developmentally disabled population. *Pennhurst,* 451 U.S. at 11–13, 101 S.Ct. at 1536–38. The Court noted that Congress is aware of the distinction between encouraging and mandating specific conduct, and knows how to impose binding obligations on a state when it wishes to do so. *Id.* at 27, 101 S.Ct. at 1544–45. If anything, the Court concluded, plaintiffs "can only claim that the state plan has not provided adequate 'assurances' to the Secretary" because that is all the Disabled Assistance Act requires the State to do. *Id.* at 28, 101 S.Ct. at 1545.

The Association tries to distinguish *Pennhurst* from the present case by arguing that § 8624(f) of the Act creates an unequivocal obligation on the part of the

State not to count funds received under the energy subsidy program as income for any purpose under state or federal law. The Association argues that this provision indicates that Congress intended to impose obligations on the states and not merely to express preferences. The Association's position here is undercut by the fact that § 8624(f) stands alone as an obligation under the Act. It is listed separately from the other sections issuing general directives for implementation of the plan, which the Association would characterize as mandatory obligations on the Commonwealth, but which we conclude reflect only congressional preferences.

Even if § 8624(f) is enforceable, as the Association suggests, it merely disallows any benefit that accrues to a household under the Plan to affect that household's other benefits or entitlements. Section 8624(f) is triggered only by operation of another statute. For example, if a governmental agency calculates a household's income to include payments received under the Act so that household then receives a lesser allotment of food stamps than it would otherwise be entitled to receive, the recipient will have an action, either judicial or administrative, under the food stamps statute. A household's ability to enforce this section, therefore, is limited to mechanisms for enforcing the entitlement statute under which its affected benefits are calculated and not necessarily under the Act.

The Association also argues that the benefit that accrues to the members of the Association is sufficiently specific and definite to qualify as an enforceable right and that the remedial scheme under the Act is insufficient to foreclose enforcement through § 1983. The Association argues that the Act is more closely related to the statute upheld as creating enforceable rights for its beneficiaries in *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), than the statute in *Pennhurst*.

In *Wright*, tenants living in low-income housing projects brought suit under § 1983 claiming violation of the Brooke Amendment to the Housing Act of 1937. The Brooke Amendment imposed a ceiling on the amount of rent to be paid by tenants of low-income housing projects defined as a percentage of household income. *Id.* at 420, 107 S.Ct. at 768–69. The Department of Housing and Urban Development ("HUD") consistently, before and after the amendment to the Housing Act, interpreted rent to include a reasonable amount for utilities. *Id.* at 420, 107 S.Ct. at 768–69. Plaintiffs alleged that the defendant overcharged them for their utilities under the applicable HUD regulations by exceeding the ceiling on the amount of rent that each household was required to pay. The Supreme Court reversed the holding of the Court of Appeals that the plaintiffs had no cause of action under § 1983. The Supreme Court found that the Brooke Amendment, in conjunction with the longstanding HUD regulations, creates an enforceable right in favor of tenants with respect to a utilities allowance. The Court found that a provision for a "reasonable" allowance for utilities was not too vague to be enforceable since the HUD regulations defined rent as including utilities and such regulations have the force of law. The Court found the remedial scheme insufficient to indicate a congressional intent to supplant a § 1983 remedy because the only relief available to tenants was a localized grievance procedure. The Court noted that no formal procedure existed for tenants to direct their complaints to HUD.

On the surface, the statute in *Wright* bears a great deal of similarity to the one at issue in this case. Both statutes are public welfare measures that concern residents of public housing. Both statutes have limited remedial schemes that provide essentially localized relief through a state administrative scheme with local administrative machinery. Although commonality exists between the two statutes, however, we find that the common elements are greatly overshadowed by distinctions that exist.

Three general themes in the Act persuade us that Congress did not intend to confer private rights enforceable under § 1983 and, therefore, that this Act is more like the statute in *Pennhurst* than the statute in *Wright*. First we note the voluntariness aspect; states are not required to participate in the energy subsidy program and can choose to forego the benefit altogether. In keeping with this acknowledgement of state autonomy, the primary method of penalizing states for failure to substantially comply with the provisions of the Act is for the Secretary to withhold funds. 42 U.S.C. § 8627. Unlike the statute in *Wright*, however, the Act mandates that the Secretary investigate complaints re-

garding the administration of the Plan. § 8627. One of the problems noted in *Wright* was that HUD was unresponsive to citizen complaints and infrequently used its audit authority to assure compliance by the states. No such allegations have been made in this case. The second important feature of the Act is the pervasive emphasis on maintaining a limited federal role. Finally, like the statute in *Pennhurst* the Act speaks in terms of giving assurances of compliance with the general directives for dispersal of the subsidies. Although the Act sets forth a series of requirements for the administration of the Plan, the language is not the type that Congress generally uses when it wishes to impose a rigid code of conduct. The Act has the state "give assurances" that the state will meet the established conditions. The Act has the chief executive officer of the state "certify that the State agrees to" the conditions. In *Pennhurst*, the Supreme Court determined that similar language in the Disabled Assistance Act did not create any substantive rights in favor of the mentally retarded. As in the Disabled Assistance Act at issue in *Pennhurst*, if the members of the Association have any claim at all under the Act, it is merely that the Commonwealth failed to provide adequate assurances to the Secretary and not that the Act is improperly administered.

The language of the Act is contractual in tone and correspondingly suggests a contractual type relationship between the state and the federal government; as noted in *Pennhurst* "in return for federal funds, the states agree to comply with federally imposed conditions." 451 U.S. at 17, 101 S.Ct. at 1540. Although the claimants may benefit from the federal-state relationship, the statute does not necessarily confer substantive rights as a result. As the Supreme Court stated in *Pennhurst*, "Congress ... plainly [understands] the difference, financial and otherwise, between encouraging a specified type of treatment and mandating it." 451 U.S. at 27, 101 S.Ct. at 1545. Since we find that this is a situation in which Congress is suggesting instead of mandating, we find that the Association has no private right of action under § 1983.

In sum we find that this statute is more akin to the statute in *Pennhurst* than in *Wright* and, therefore, that plaintiffs cannot sustain a private right of action under § 1983.

Accordingly, the injunction issued by the District Court is dissolved, and its judgment, finding original federal jurisdiction to order relief against the state in connection with the award of benefits under the Act, is reversed.

### ORDER

#### March 30, 1992.

The Northern Kentucky Welfare Rights Association ("the Association") has petitioned this Court for a rehearing of our decision in this case and suggests a rehearing *en banc.* The Association argues that our decision is contrary to the decision of the Supreme Court in *Wilder v. Virginia Hospital Association,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), a case that we did not consider when reaching our decision, and *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), a case which we considered, but distinguished from the situation presented here. Because we adhere to the reasoning of our original decision, we deny the petitioner's motion.

Although the petitioner did not bring *Wilder* to our attention earlier, we have reviewed it and do not believe that it changes the ourcome in this case. In *Wilder,* the Supreme Court held that health care providers could bring an action under § 1983 to challenge the method by which a state calculates reimbursement levels under the Medicaid Act. The Association argues that in the course of determining that the statute establishing the federally funded, state-administered system for reimbursing health care providers creates rights enforceable by the providers, the Supreme Court specifically rejected the key principles on which we based our decision that the Low Income Home Energy Assistance Act (the "Energy Act") did not create enforceable rights. We disagree that the two statutes are indistinguishable with respect to whether they create substantive rights enforceable under § 1983.

It is true as the Association points out, that like the Energy Act the Medicaid Act is voluntary, emphasizes a limited federal role, and creates a cooperative, contractual type arrangement between the federal government and the states. We find two important distinctions, however, between the statutes. First, unlike the Medicaid

Act, the Energy Act establishes by its express terms the remedy: an individual, private right of administrative action in the state. This suggests a remedial scheme "sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy under 1983." *Wilder*, 110 S.Ct. at 2524. Second, as a practical matter, we noted in our original opinion that, "[w]e find no strong federal interest in what amounts to adjudicating monthly energy bills. We can think of no welfare benefits program where beneficiaries can sue directly in federal court without first engaging the administrative process." (Op. at p. 1184).

*Wilder* does not hold that Medicaid beneficiaries have a private right of action. The Medicaid Act is not designed to benefit health care providers, but the indigent patients served by those providers. In order for *Wilder* to be on point, it would have to hold that recipients of care under the Medicaid Act have an immediate private right of action in federal court. But that is not what *Wilder* holds. For the reasons stated in our opinion, we do not believe that Congress intended to give individual beneficiaries of the Energy Act a substantive right enforceable in federal court under 42 U.S.C. 1983.

The Association also argues that it should be able to invoke federal court jurisdiction when seeking declaratory and injunctive relief for claims of systemic violations in the administration of the subsidy program even if individuals have no right to sue for damages. We agree that a distinction can be made between suing for declaratory or injunctive relief and suing for damages, but there is no indication that Congress intended to make such a distinction here. Moreover, it would not be difficult for an individual to transform a personal grievance into a systemic claim. There is no reason why a systemwide challenge cannot be made by an individual through an administrative action.

For these reasons we deny petitioner's motion for a rehearing and suggestion for a rehearing *en banc.*