**LOCAL 3–689, OIL, CHEMICAL & ATOMIC INTERNATIONAL UNION, Plaintiff–Appellant,**

v.

**MARTIN MARIETTA ENERGY SYSTEMS, INC.; Department of Energy, Defendants–Appellees.**

No. 94–4071.

United States Court of Appeals, Sixth Circuit.

Submitted Dec. 7, 1995.

Decided Feb. 26, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied May 6, 1996.

John R. Doll (briefed), Julie C. Ford (briefed), Logothetis & Pence, Dayton, OH, for Local 3–689, Oil, Chemical and Atomic International Union.

Thomas M. Tarpy (briefed), Robert A. Harris, Vorys, Sater, Seymour & Pease, Columbus, OH, for Martin Marietta Energy Systems, Inc.

John S. Koppel (briefed), Anthony J. Steinmeyer, U.S. Department of Justice, Appellate Staff, Civil Division, Washington, DC, for Department of Energy.

Before: SILER and MOORE, Circuit Judges; FORESTER, District Judge.[*]

SILER, Circuit Judge.

Plaintiff Local 3–689, Oil, Chemical & Atomic International Union ("the union") appeals the district court's dismissal of its claims against defendants Martin Marietta Energy Systems, Inc. ("MMES") and the

Department of Energy ("the DOE") brought pursuant to the Energy Policy Act of 1992 ("the Energy Act") and the National Labor Relations Act ("NLRA"). The union attacks three findings of the district court: the Energy Act did not give the union a private right of action; sovereign immunity protected the DOE against the union's claims; and the NLRA did not provide the court with jurisdiction over the union's claims against MMES. For the reasons stated herein, we affirm in part and reverse and remand in part the decision of the district court.

I.

The union and MMES entered into a collective bargaining agreement ("CBA") that covered workers at the Portsmouth Gaseous Diffusion Plant in Piketon, Ohio.[1] The agreement expired on May 2, 1991, and the parties were unable to come to terms on a new contract. The union alleges that MMES subsequently changed the terms and conditions of employment for the Piketon plant. As a result, the union brought this action on June 11, 1993, contending that: 1) MMES violated an Energy Act provision that required employers at uranium facilities to comply with the terms of the existing CBA; 2) the DOE failed to require MMES to comply with this statutory obligation; 3) MMES violated the NLRA; and 4) the DOE violated a provision of the Energy Act by permitting uranium reserve stockpiles to be used for non-military purposes. Both MMES and DOE filed motions to dismiss the union's complaint for failure to state a claim upon which relief could be granted. On August 5, 1994, the district court granted these motions.

II.

The union contends that two provisions under the Energy Act[2] permit it a forum in

---

[*] The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. This facility enriches and processes uranium. The Piketon plant is owned by the DOE and operated under contract by MMES.

2. The Energy Policy Act of 1992 was a broad-based enactment that promoted energy conservation and efficiency, partially in response to the Persian Gulf crisis. *See generally* Jim Rossi, *Lessons From the Procedural Politics of the "Comprehensive" National Energy Policy Act of 1992*, 19 Harv Envtl. L. Rev. 195 (1995). Title IX of the Energy Act established the United States Enrich-

federal courts: MMES impermissibly violated the labor provision prescribed in 42 U.S.C. § 2297b–4;[3] and the DOE misappropriated the uranium reserve in violation of 42 U.S.C. § 2296b–1.[4] Neither provision explicitly provides a private right of action. Thus, the union may proceed only if it has an implied private right of action under the Energy Act.

▪ The framework for finding an implied right of action in a federal statute was initially constructed in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* established four factors to consider in finding an implied right of action: (1) whether plaintiff is among the class of persons intended to benefit by enactment of the statute; (2) whether Congress indicated legislative intent to provide or deny a private remedy; (3) whether a private remedy would be consistent with the underlying purposes of the legislative scheme; and (4) whether the action is traditionally delegated to state law and would be inappropriate to imply a federal remedy. 422 U.S. at 78, 95 S.Ct. at 2087–88; *see also Cabinet for Human Resources v. Northern Ky. Welfare Rights Ass'n*, 954 F.2d

1179, 1182 (6th Cir.1992) (reiterating standard). Subsequent cases have clarified

> that in determining whether a private right of action is implicit in a statute, the "focal point is Congress' intent in enacting the statute." Therefore, "unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist."

*Ellison v. Cocke County, Tenn.*, 63 F.3d 467, 470 (6th Cir.1995) (citations omitted); *see Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979); *Bailey v. Johnson*, 48 F.3d 965, 968 (6th Cir.1995) (affirming that *Cort* has been modified and Congressional intent is paramount). The *Cort* factors are simply tools to divine the intent of Congress in the event of statutory silence. *See Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1028 (6th Cir. 1990), *cert. denied*, 498 U.S. 1086, 111 S.Ct. 961, 112 L.Ed.2d 1048 (1991).[5]

---

ment Corporation, an entity that would eventually be privatized and replace DOE as the provider of uranium enrichment services. Title X of the Energy Act provided in part for the establishment of a National Strategic Uranium Reserve, restricting certain reserves of uranium for military purposes and government research until 1998.

3. 42 U.S.C. § 2297b–4 reads in pertinent part:

(d) **Treatment of persons employed prior to transition date**

Compensation, benefits, and other terms and conditions of employment in effect immediately prior to the transition date, whether provided by statute or by rules of the Department or the executive branch, shall continue to apply to officers and employees who transfer to the Corporation from other Federal employment until changed by the Board.

(e) **Protection of existing employees**

(1) **In general**

It is the purpose of this subsection to ensure that the establishment of the Corporation pursuant to this subchapter shall not result in any adverse effects on the employment rights, wages, or benefits of employees at facilities that are operated, directly or under contract, in the performance of the functions vested in the Corporation.

(2) **Applicability of existing collective bargaining agreement**

Any employer (including the Corporation) at a facility described in paragraph (1) shall abide by the terms of a collective bargaining agreement in effect on April 30, 1991, at each individual facility until—

(A) the earlier of the date on which a new bargaining agreement is signed; or

(B) the end of the 2–year period beginning on October 24, 1992.

4. 42 U.S.C. § 2296b–1 reads:

There is hereby established the National Strategic Uranium Reserve under the direction and control of the Secretary. The Reserve shall consist of natural uranium and uranium equivalents contained in stockpiles or inventories currently held by the United States for defense purposes. Effective on October 24, 1992, and for 6 years thereafter, use of the Reserve shall be restricted to military purposes and government research. Use of the Department of Energy's stockpile of enrichment tails existing on October 24, 1992, shall be restricted to military purposes for 6 years thereafter.

5. The Supreme Court has demonstrated reluctance in finding implied rights of action. *See, e.g., Suter v. Artist M.*, 503 U.S. 347, 363–64, 112 S.Ct. 1360, 1370–71, 118 L.Ed.2d 1 (1992) (rejecting implied private right of action under the Adoption Assistance and Child Welfare Act); *Karahalios v. National Fed'n of Fed. Employees,*

*A. Violation of the 42 U.S.C. § 2297b–4 collective bargaining provision*

 The mandate to "abide by the terms of [the] collective bargaining agreement in effect on April 30, 1991," 42 U.S.C. § 2297b–4(e)(2), undeniably benefitted a "specific and identifiable class," of which the employees of the Piketon plant were members. *See Ellison,* 63 F.3d at 470. The underscoring purpose of this section of the Energy Act—the creation of the United States Enrichment Corporation—was to "provid[e] enrichment services in a business-like fashion, maximiz[e] economic return to the Treasury, promot[e] private sector commercialization ... and help[ ] to maintain a reliable, domestic source of enriched uranium." *See* H.R.Rep. No. 102–474 (VIII), 102d Cong., 2d Sess. 112 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2282, 2330; *see also* 42 U.S.C. § 2297a. The collective bargaining provision was "essential to that endeavor." *Ellison,* 63 F.3d at 471. It was

> *Local 1263,* 489 U.S. 527, 536, 109 S.Ct. 1282, 1288–89, 103 L.Ed.2d 539 (1989) (finding that Title VII of the Civil Service Reform Act did not imply a private right of action); *Thompson,* 484 U.S. at 190, 108 S.Ct. at 521–22 (Scalia, J., concurring) (noting that nine of last eleven claims of implied rights have been denied); *see also Health Care Plan, Inc. v. Aetna Life Ins. Co.,* 966 F.2d 738, 740 (2d Cir.1992) ("The Supreme Court, without expressly overruling the earlier precedents, for all practical purposes has adopted Justice Powell's dissenting views in *Cannon.* ...."). *But see Franklin v. Gwinnett County Pub..Sch.,* 503 U.S. 60, 65, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (1992) (affirming earlier precedent that Title IX of the Education Amendments implies a private right of action). The cases in which an implied right has been found "involved statutory language that, in the judicial interpretation of related legislation prior to the subject statute's enactment, or of the same legislation prior to its reenactment, had been held to create private rights of action." *Thompson,* 484 U.S. at 189–90, 108 S.Ct. at 521 (Scalia, J., concurring) (citing *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)).

6. Congress understood the tensions between management and labor at the Piketon plant:

> While this Committee amendment was being considered, the workers at the Portsmouth, Ohio uranium enrichment plant were on strick [sic] against the operator of that facility. Portsmouth is one of the facilities that will be

a transition rule that was added to ensure that at the outset of the Corporation's operation, employees at facilities operated by the Corporation would be covered by the collective bargaining agreement in effect in May of 1991 at such facilities.

H.R.Rep. No. 102–474 (VIII), 102d Cong., 2d Sess. 112–13 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2282, 2330–31.[6] Similarly, the provision

> provides a reasonable transition of employment rights at Corporation facilities. It assures that the employees are not disadvantaged by a change in the legal definition or status of their employer. It provides a reasonable period of time to negotiate a new contract, during which the employees would be covered by their old contract.

*Id.* It is clear that with § 2297b–4, Congress intended to protect workers at uranium enrichment facilities.[7]

> operated by the Corporation. Recently the employees made an unconditional offer to return to work, even though agreement on a new contract had not been reached. The old contract had expired in May of 1991.
>
> Special consideration for the employees is warranted· for several reasons. Charges are currently pending before the National Labor Relations Board alleging that the strike was caused by the bad faith bargaining by the operators. In addition, during the strike, because the operator had a cost-plus contract with the Department of Energy ("DOE"); the operator was able to charge the DOE for any costs incurred due to the strike. This left the employees with virtually no leverage in the negotiations that have taken place and continue today.

H.R.Rep. No. 102–474 (VIII), 102d Cong., 2d Sess. 112 (1992), *reprinted in* 1992 U.S.C.A.A.N. 2282, 2330.

7. The union is also correct in explaining that the issues raised in the complaint are traditionally handled in federal forums rather than the states, thereby meeting the fourth *Cort* factor. "The fourth factor of the *Cort* test is not at issue because the complaint arises under a federal act and thus is not an area traditionally left to the states." *Cabinet for Human Resources,* 954 F.2d at 1183 (finding no private cause of action even though only federal issues were involved); *see also American Fed'n of State, County and Mun. Employees, Local 506 v. Private Indus. Council of Trumbull County,* 942 F.2d 376, 381 (6th Cir. 1991) (same); *Lamb,* 915 F.2d at 1030 (same); *cf. Thompson,* 484 U.S. at 186–87, 108 S.Ct. at

The purpose and the beneficiaries of the statute notwithstanding, no language in § 2297b–4 evinces a Congressional intent to create a private right of action for violations of the collective bargaining agreement. *See Ellison*, 63 F.3d at 470 (" '[T]he question is not simply who would benefit from the act, but whether Congress intended to confer federal rights upon those beneficiaries.' ") (quoting *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981)); *see also Touche Ross*, 442 U.S. at 568, 99 S.Ct. at 2485 (" '[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.' ") (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979)). Thus, the analysis should continue "with an eye toward determining Congress' perception of the law that it was shaping." *Ellison*, 63 F.3d at 470 (quoting *Thompson*, 484 U.S. at 180, 108 S.Ct. at 516–17).

■ Other legislative history undermines the union's position. The union concedes that prior to passage of the Act, Congress considered and rejected a version that would have allowed a private right of action for damages. *See* H.R.Rep. No. 102–474(I), 102d Cong., 2d Sess. 203–04 (1992), *reprinted in* 1992 U.S.C.C.A.N. at 2027. "The unexplained deletion of a single phrase from a jurisdictional provision is, of course, not determinative of whether a private remedy exists. *But it is one more piece of evidence that Congress did not intend to authorize a cause of action* ...." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 22, 100 S.Ct. 242, 248, 62 L.Ed.2d 146 (1979) (emphasis added). As the court below stated, "it is illogical to presume that Congress intended to accomplish by implication that which it had chosen not to enact explicitly." *See Bailey*, 48 F.3d at 968 (rejecting private cause of action under the Food, Drug & Cosmetic Act in part because Congress considered and rejected a private right of action); *see also Thompson*, 484 U.S. at 185,

519–20 (permitting federal forum would have "entangled" the federal courts in traditional

108 S.Ct. at 519 (rejecting federal forum availability under the Parental Kidnapping Prevention Act in part because Congress considered and rejected this approach); *Lamb*, 915 F.2d at 1029 (finding that deletion of a provision which expressly conferred a private right of action under the Foreign Corrupt Practices Act was "significant").

Moreover, there is no indication that implying a federal right of action pursuant to § 2297b–4 would be "consistent with the underlying purposes of the legislative scheme." *Ellison*, 63 F.3d at 471 (quoting *Cort*, 422 U.S. at·78, 95 S.Ct. at 2087–88). The union contends that the instant statute did not provide alternative remedies to enforce future violations, distinguishing this case from others that did not imply a right of action. *Cf. Transamerica*, 444 U.S. at 14–15, 100 S.Ct. at 244–45 (enacting criminal penalty to enforce statute); *Bailey*, 48 F.3d at 967–68 (same); *Ellison*, 63 F.3d at 470 (same); *Cabinet for Human Resources*, 954 F.2d at 1182 (establishing administrative remedies for aggrieved claimants); *American Fed'n of State, County and Mun. Employees, Local 506 v. Private Indus. Council of Trumbull County*, 942 F.2d 376, 380 (6th Cir.1991) (same). Thus, the union alleges that failure to infer a cause of action would render § 2297b–4 nugatory. *See Lamb*, 915 F.2d at 1030 (discussing the merits of private cause of action being the only viable mechanism for redressing violation); *cf. Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2488–89 (explaining that discussion on whether an implied private remedy is necessary to effectuate the purpose of the statute may not be relevant). However, this court does not find the union's claims convincing. Congress expressly provided that the "Corporation is subject to the provision of the National Labor Relations Act." 42 U.S.C. § 2297b–4(e)(3). The fact that this provision is contained in the same subsection as the statute at issue implies a Congressional intent that disputes such as this one must be resolved through the remedial procedures of the NLRA as the sole enforcement mechanism. *See also infra* section IV (suggesting

state-law questions).

that the union may have a claim under the NLRA).[8]

The placement of § 2297b–4, codified in chapter 23 of Title 42, United States Code, further weighs against the union. Also found in chapter 23 is 42 U.S.C. § 2271(c):

No action shall be brought against any individual or person for any **violation under this chapter** unless and until the Attorney General of the United States has advised the [Nuclear Regulatory] Commission with respect to such action and **no such action shall be commenced except** by the Attorney General of the United States.

(emphasis added). This provision expressly precludes private judicial enforcement under this chapter. *See, e.g., County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 59 (2d Cir.1984) (listing cases in accord). While § 2297b–4 was enacted under a separate division, both it and § 2271(c) were codified under the umbrella of chapter 23. "[P]lacement of the statute reinforce[s] th[e] conclusion" that no private right of action was intended. *Thompson*, 484 U.S. at 183, 108 S.Ct. at 518.

The union correctly suggests that the findings accompanying the statute indicate concern for the Piketon employees; however, "nothing in those findings suggests an intent to grant [the union] a private claim under the Act." *Bailey*, 48 F.3d at 968.[9] This court's analysis confirms that it is "not compatible with the purpose and context of the legislative scheme to infer a private cause of action." *Thompson*, 484 U.S. at 183, 108 S.Ct. at 518. The union did not meet its burden of showing that Congress intended § 2297b–4 to be enforced through private rights of action. *See Suter v. Artist M.*, 503 U.S. 347, 363–64, 112 S.Ct. 1360, 1370–71, 118 L.Ed.2d 1 (1992) (emphasizing that burden is on proponent of implied right).

### B. Claims for misuse of the uranium reserve

■ The union goes to great lengths to show that the establishment of the uranium reserve under § 2296b–1 was intended to protect the domestic uranium economy and uranium processing workers. Even were this assertion true, however, the union does not establish that Congress intended to confer any substantive rights—which could be enforced through a private right of action—when it established the uranium reserve. The above discussion applies to this provision; there was absolutely no showing that Congress anticipated that the uranium reserve provision would be enforced through private rights of action.[10]

### III.

■ Although the Energy Act fails to provide the union with a private right of action,

---

8. This court agrees that in some circumstances, the purposes of a statute can better be achieved through private enforcement. However, as the *Thompson* court suggested,

> We note, as a preliminary response, that ultimate review remains available in this Court for truly intractable jurisdictional deadlocks.... [A]ny more radical approach to the problem will have to await further legislative action; we "will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."

484 U.S. at 187, 108 S.Ct. at 520 (quoting *California v. Sierra Club*, 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981)).

9. The purpose of the provision was not to create private rights as much as it was to ensure a smooth transition of employment rights when the Enrichment Corporation took over. The *Ellison* court, interpreting a statute which protected the confidentiality of patient records, established that

"nothing in the statute's legislative history reveals an intent to create a private right of action; it merely emphasizes the importance of preserving the confidentiality of patient records in order to encourage individuals to seek treatment." *Ellison*, 63 F.3d at 471. Similarly, the statute at hand "merely emphasized the importance" of a smooth transition, preserving employment rights and "assur[ing] that the employees are not disadvantaged by a change in the legal definition ... of their employer." H.R.Rep. No. 102–474 (VIII), 102d Cong., 2d Sess. 112–13 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2282, 2330–31.

10. The union's best argument that Congress implied a private remedy in § 2296b–1 is that "[t]here is nothing in the legislation that evinces any intention to deny a private right of action to enforce it." However, this standard for implying a private right of action has not been adopted. As discussed above, it is incumbent upon the union to show that Congress intended a private right of action.

thereby mooting the sovereignty issue as it relates to the Energy Act,[11] the union contends that its non-monetary claims can be brought against the DOE pursuant to the Administrative Procedure Act ("APA").[12] In pertinent part, the APA provides that

> [a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency ... failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702; *see, e.g., Newsom v. Vanderbilt Univ.*, 653 F.2d 1100, 1107 (6th Cir.1981). No provision in the Energy Act precludes the availability of judicial review in this manner. Thus, the DOE's alleged failure to abide by the terms of the Energy Act can be reviewed under the APA framework.

■ The issue thus presented is whether this court will reach the merits of the union's APA arguments.[13] As a general rule, this court will not consider arguments raised for the first time on appeal absent exceptional circumstances. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir.1994); *Elkins v. Richardson–Merrell, Inc.*, 8 F.3d 1068, 1072 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1299, 127 L.Ed.2d 651 (1994). The union has not presented this court with any exceptional circumstances. Because the union did not adequately raise this argument before the district court, we decline to consider that issue for the first time on appellate review.

## IV.

■ The union contends that its claim against MMES can be brought under the NLRA pursuant to 29 U.S.C. § 185 (conferring federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization"). Generally, the NLRA does not confer federal jurisdiction to labor violations that occur after the expiration of a CBA; an agreement must exist before a plaintiff can bring suit for its breach. *See Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25–27 (2d Cir.1988). The union, however, argues that § 2297b–4 of the Energy Policy Act *extended* the duration of the parties' agreement, thereby creating the possibility that MMES's actions constituted a breach cognizable under the NLRA.

MMES interprets § 2297b–4(e)(2) differently. It suggests that the statute sets the terms and conditions of employment for the union members at the Piketon facility for a specific transitional period of time coincident with the transfer of authority at the Piketon facility to the USEC. The district court, citing *Derrico*,[14] agreed that the

> situation is similar to the situation that arises upon the expiration of a collective bargaining agreement, but prior to the point where the parties reach an impasse in negotiating over a new agreement.... [I]n such a situation, by operation of law, although the contract itself is over, the terms and conditions of the expired contract continue in effect, but a district court does not possess jurisdiction for actions for breach of the terms and conditions of the expired agreement.

11. The union contends that the Energy Act waived sovereign immunity, thereby permitting suit against the Department of Energy. *See* 42 U.S.C. § 2297c–5(a) to (b). It is doubtful that these statutes confer the requisite "unequivocal expression" of waiver of sovereignty, *see United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992); nonetheless, as it has already been decided that the requisite statutes do not imply private rights of action, this court need not reach whether the Energy Act waives sovereign immunity.

12. As the only possible avenue for litigation against the DOE rests with the union's non-monetary claims, any monetary claims asserted by the union against the DOE are dismissed.

13. It is questionable whether (1) the DOE was under any obligation to enforce the collective bargaining provision of § 2297b–4(e); or (2) the union had standing to bring a claim based on the uranium reserve provision of § 2296b. The district court did not reach the merits of these claims.

14. *Derrico*, while instructive, is inapposite. In *Derrico*, "neither side argue[d] that [the CBA] was expressly or impliedly extended." 844 F.2d at 22. The issue at hand is precisely whether the CBA between the union and MMES was "impliedly or expressly extended" by § 2297b–4(e).

The union is not without support that rights under a CBA can be "preserved by statute." *Enterprise Wheel & Car Corp. v. United Steelworkers of Am.*, 269 F.2d 327, 331 (4th Cir.1959), *rev'd in part on other grounds*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The question thus becomes whether Congress intended to "preserve" the CBA rights with the passage of § 2297b–4(e)(2). The provision mandates that requisite employers "shall abide by the terms of a collective bargaining agreement in effect on April 30, 1991." On April 30, 1991, the 1988 CBA between the union and MMES was still in effect—it was due to expire on May 2, 1991. Congress knew of the labor difficulties at the Piketon plant. It appears that the Congress, wanting a smooth transition for the takeover by the Uranium Enrichment Corporation, intended to pre-empt any labor difficulties by extending the duration of the CBA.

This issue appears to be a matter of first impression. MMES correctly asserts that no authority exists for the proposition that the Energy Act extends the term of the CBA between the union and MMES. Similarly, however, MMES has not cited any other instance in which a substantive statute addresses the terms and conditions of labor contracts in a particular industry or in particular facilities. The union's interpretation is the most logical reading of this unique provision. Thus, the union should be able to pursue its claim under the NLRA.[15]

The district court's dismissals under the Energy Act are AFFIRMED, but its dismissal of the claim under the NLRA is REVERSED and REMANDED for further action consistent with this opinion. We take no action regarding the claims under the Administrative Procedure Act, as they have not yet been presented to the district court.

---

**15.** It is notable that failing to provide a remedy under the NLRA would enhance the union's first argument that Congress implied a private right of action. *See infra* discussion at section II. It should be emphasized that this court is not commenting on the merits of the union's claims; rather, this court merely holds that this unique provision conferred jurisdiction upon the district court over this claim pursuant to the NLRA.