# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 9, 2020　　　Decided September 24, 2021

No. 19-5321

KLINT L. MOWRER & FRED WEAVER, JR.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01158)

———

*Charles R. Stinson* argued the cause for appellants. With him on the briefs was *Paul D. Cullen, Jr.*

*Caroline D. Lopez*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Mark B. Stern*, Attorney, *Steven G. Bradbury*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel for Litigation and Enforcement, *Joy K. Park*, Senior Trial Attorney, and *Charles J. Fromm*, Deputy Chief Counsel, Federal Motor Carrier Safety Administration.

Before: WILKINS and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Concurring opinion filed by *Circuit Judge* KATSAS.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* RANDOLPH.

KATSAS, *Circuit Judge*:  The Fair Credit Reporting Act (FCRA) governs the release of consumer reports by consumer reporting agencies.  This appeal presents the question whether the Federal Motor Carrier Safety Administration acts as a consumer reporting agency by distributing safety records of commercial truck drivers to prospective employers, as required by another federal statute.  We hold that the Administration does not act as a consumer reporting agency in doing so, and we therefore affirm the dismissal of this FCRA damages action.

I

A

Congress enacted FCRA to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  To those ends, FCRA comprehensively regulates consumer reporting agencies.  Three of its obligations are directly relevant here.  First, in preparing any consumer report, a consumer reporting agency must follow reasonable procedures to ensure that the report is as accurate as possible. 15 U.S.C. § 1681e(b).  Second, a consumer reporting agency must investigate the accuracy of its records about a consumer upon the consumer's request.  *Id.* § 1681i(a)(1)(A).  Third, if a consumer reporting agency includes in a consumer report any information that the consumer disputes, the report must note the dispute and summarize the consumer's position.  *Id.* §§ 1681c(f), 1681i(b)–(c).

FCRA defines its key terms "consumer reporting agency" and "consumer report." A "consumer reporting agency" is "any person which, for monetary fees … regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). A "consumer report" is any communication by a consumer reporting agency that meets two further criteria. First, the communication must bear on a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." *Id.* § 1681a(d)(1). Second, the report must "serv[e] as a factor in establishing the consumer's eligibility" for one of several purposes, including "employment purposes," *id.* § 1681a(d)(1)(B), which means "evaluating a consumer for employment, promotion, reassignment or retention as an employee," *id.* § 1681a(h). A "consumer" means an "individual." *Id.* § 1681a(c).

FCRA authorizes the award of money damages to consumers injured by certain violations of the statute. It imposes liability for actual damages on "[a]ny person" who negligently violates FCRA. 15 U.S.C. § 1681o(a)(1). It imposes liability for actual or statutory damages on "[a]ny person" who willfully violates FCRA. *Id.* § 1681n(a)(1)(A). And it defines "person" to include any "government or governmental subdivision or agency." *Id.* § 1681a(b).

B

Since 1998, Congress has required the Department of Transportation to collect information on the safety of commercial motor carriers and drivers. *See* 49 U.S.C. § 31106(a)(3)(B). The Department stores this information in a database called the Motor Carrier Management Information

System (MCMIS), which it administers through the Federal Motor Carrier Safety Administration. *See* Privacy Act of 1974: System of Records, 65 Fed. Reg. 83,124, 83,124–25 (Dec. 29, 2000). The Administration obtains much of its information from state governments, which submit it as a condition of receiving federal grants. 49 U.S.C. § 31102(c)(2)(L), (P); 49 C.F.R. § 350.207(a)(12).

The MCMIS contains a wide range of information on commercial drivers, including crash reports and records of roadside inspections. *See* 65 Fed. Reg. at 83,125. The Administration uses this information to guide the operation of its Motor Carrier Safety Assistance Program, *see id.*, which involves grants to states and other political jurisdictions to improve motor-carrier safety, *see* 49 U.S.C. § 31102; 49 C.F.R. § 350.101 *et seq.* The agency also uses the information to guide enforcement actions, *see* 65 Fed. Reg. at 83,124–25, which include placing out of service commercial drivers who pose an imminent safety hazard, 49 U.S.C. § 521(b)(5).

In 2005, Congress directed the Administration to make certain "reports contained in the [MCMIS]" available to pre-employment screeners for the motor-carrier industry. Safe, Accountable, Flexible, Efficient (SAFE) Transportation Act, Pub. L. No. 109-59, sec. 4117(a), § 31150(a), 119 Stat. 1144, 1728 (2005) (codified at 49 U.S.C. § 31150(a)). The Administration implemented this direction by creating the Pre-Employment Screening Program (PSP), which allows prospective employers to access crash and inspection reports on commercial drivers. *See* Privacy Act of 1974; System of Records Notice, 75 Fed. Reg. 10,554, 10,556 (Mar. 8, 2010). The PSP charges a fee for these records and provides them only with a driver's written consent. *Id.*

5

The SAFE Transportation Act requires the Administration to satisfy four conditions before releasing MCMIS records to prospective employers. First, the Administration must ensure that any information is released "in accordance with [FCRA] and all other applicable Federal law." 49 U.S.C. § 31150(b)(1). Second, it must ensure that the driver consents to release of the information. *Id.* § 31150(b)(2). Third, it must ensure that the screener does not release the information to any other person. *Id.* § 31150(b)(3). Fourth, it must provide a procedure for the driver to correct inaccurate information in the System. *Id.* § 31150(b)(4).

To comply with the last requirement, the Administration created a system called DataQs, which allows drivers to challenge information in their PSP reports. Pre-Employment Screening Program, 77 Fed. Reg. 42,548, 42,551 (July 19, 2012). DataQs forwards challenges to the state that submitted the contested information, and the state then decides whether to modify or remove it. *Id.*

C

Klint Mowrer and Fred Weaver are commercial truck drivers who received citations for violating state vehicle-safety laws. Mowrer received a citation because his "rear drag link" had too much "play by hand pressure," and Weaver received a citation for failing to obey a "direction to be weighed." J.A. 213, 215. State officials reported these citations to the Administration for inclusion in the MCMIS. After state courts dismissed misdemeanor charges arising from the citations, the drivers asked the Administration to remove them from the MCMIS. The Administration forwarded the requests to the relevant state agencies, which declined to remove the citations. The drivers later authorized the release of their PSP reports to

prospective employers. They now allege harm from the inclusion of their citations in those reports.

Mowrer sued the Administration in 2012. Joined by three other drivers and a trade association, he raised claims under FCRA, the Administrative Procedure Act, and the Privacy Act. Weaver filed a similar action in our court, which we transferred to the district court. *Weaver v. FMCSA*, 744 F.3d 142, 148 (D.C. Cir. 2014). In 2014, the drivers filed a consolidated complaint, which raised FCRA and APA claims but no Privacy Act claim. The drivers sought both damages under FCRA and prospective relief under the APA.

In 2015, the Administration moved to dismiss the complaint. The district court denied the motion. As relevant here, it held that FCRA waives federal sovereign immunity from damages for FCRA violations. *Owner-Operator Indep. Drivers Ass'n v. Foxx*, Nos. 12-1158, 14-548, 2015 WL 13651262, at *4 n.3 (D.D.C. Mar. 10, 2015).

In 2016, the district court dismissed the complaint for lack of standing. *Owner-Operator Indep. Drivers Ass'n v. DOT*, 211 F. Supp. 3d 252, 261–62 (D.D.C. 2016). We affirmed in part and reversed in part. 879 F.3d 339 (D.C. Cir. 2018). First, we held that Mowrer and Weaver had Article III standing to seek damages based on the Administration's release of their safety records to prospective employers. *Id.* at 345. Next, we held that the drivers and their co-plaintiffs lacked standing to seek injunctive relief, as the MCMIS no longer contained any disputed information. *Id.* at 346–47. We thus remanded for further proceedings on the damages claims under FCRA. *Id.* at 347.

In May 2018, the drivers moved to amend their complaint to seek injunctive relief and to resurrect the Privacy Act claims that they previously had asserted individually. The district

court denied the motion on the ground that our prior decision had foreclosed injunctive relief, but it invited the drivers to add Privacy Act claims in a separate motion. *Owner-Operator Indep. Drivers Ass'n v. DOT*, 316 F. Supp. 3d 201, 206 (D.D.C. 2018). The drivers again moved to add those claims in July 2018. But after receiving briefing on the issue, the court denied that motion as well. It reasoned that the drivers had unduly delayed in seeking to revive their Privacy Act claims and, in the alternative, that the drivers had waived the claims by omitting them from their consolidated complaint. *Mowrer v. DOT*, 326 F.R.D. 350, 353 (D.D.C. 2018). The operative complaint thus seeks relief only under FCRA.

The drivers allege that the Administration violated FCRA in three ways: by not following reasonable procedures to ensure that their PSP reports were as accurate as possible, by failing to investigate the accuracy of their PSP reports upon request, and by refusing to add a statement of dispute to their PSP reports. The drivers seek actual or statutory damages.

The district court dismissed the complaint on the ground that the Administration, in releasing MCMIS records as required by the SAFE Transportation Act, is not a "consumer reporting agency" under FCRA. *Mowrer v. DOT*, No. 12-1158, 2019 WL 4418747, at *6 (D.D.C. Sept. 16, 2019).

On appeal, the drivers challenge both the dismissal of their FCRA claim and the denial of their July 2018 motion to amend. We have appellate jurisdiction under 28 U.S.C. § 1291.

II

Before reaching the merits, we consider whether Congress has waived the federal government's sovereign immunity from damages claims under FCRA.

A waiver of sovereign immunity "must be unequivocally expressed in statutory text." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (cleaned up). Any ambiguities must be "construed in favor of immunity," and ambiguity exists if there is a "plausible interpretation of the statute that would not authorize money damages against the Government." *Id.* at 290–91. At the same time, waiving sovereign immunity does not require "magic words." *Id.* at 291. We instead require only that the waiver "be clearly discernable from the statutory text in light of traditional interpretive tools." *Id.*

FCRA meets this standard. It provides that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer" for either "actual damages" or statutory "damages" within specified dollar ranges. 15 U.S.C. § 1681n(a)(1)(A). "[T]his subchapter" refers to subchapter III of chapter 41 of Title 15, which contains FCRA. *See id.* §§ 1681–1681x. Likewise, FCRA provides that "[a]ny person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer" for "actual damages." *Id.* § 1681o(a)(1). FCRA also defines the term "person"—it states that "for the purposes of this subchapter ... [t]he term 'person' means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." *Id.* § 1681a(a)–(b). For willful violations, FCRA provides one cause of action against "[a]ny person," *id.* § 1681n(a)(1)(A), and an additional cause of action against any "natural person," *id.* § 1681n(a)(1)(B).

Together, these provisions speak clearly enough to waive federal sovereign immunity. FCRA defines "person" to include "any ... government"—a term that, as used in a federal statute, surely includes the federal government. FCRA makes the definition generally applicable to subchapter III, which

includes its private causes of action. Through those causes of action, FCRA imposes monetary liability on "any person" who willfully or negligently violates its terms. And it distinguishes between liability that runs against "any" person and liability that runs only against "natural" persons, reflecting a calibrated approach to the question of which persons should bear which liabilities. For these reasons, the Seventh Circuit correctly held that FCRA waives federal sovereign immunity. *Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014).

The Fourth and Ninth Circuits have reached the opposite conclusion, *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799 (4th Cir. 2019); *Daniel v. Nat'l Park Serv.*, 891 F.3d 762 (9th Cir. 2018), but their reasoning is unpersuasive.

These courts noted that FCRA contains a second, more specific waiver of sovereign immunity. *Robinson*, 917 F.3d at 803–04; *Daniel*, 891 F.3d at 771–72. Section 626 of FCRA requires consumer reporting agencies to disclose certain information to the Federal Bureau of Investigation, 15 U.S.C. § 1681u(a)–(b); permits the FBI to disseminate that information to other federal agencies in limited circumstances, *id.* § 1681u(g); and imposes damages liability on "[a]ny agency or department of the United States obtaining or disclosing any consumer reports, records, or information contained therein in violation of this section," *id.* § 1681u(j). But there is a good reason why section 626 specifically targets federal agencies, as only they may lawfully receive consumer information under it. The fact that section 626 imposes liability only on federal agencies thus says little about whether FCRA's other causes of action cover the United States through broader language encompassing "any ... government."

The Fourth Circuit reasoned that if FCRA's definition of "person" applied to its primary causes of action, then a serious constitutional question would arise. *Robinson*, 917 F.3d at 805.

For if those causes of action run against "any ... government," they would cover state governments even though Congress cannot abrogate state sovereign immunity under the Commerce Clause. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 47 (1996). But even if FCRA unconstitutionally imposes damages liability on *state* governments, there is no constitutional bar to Congress waiving the sovereign immunity of the *federal* government. Moreover, although ambiguous statutes do not abrogate state sovereign immunity—just as they do not waive federal sovereign immunity—that does not license courts to disregard the clear terms of unambiguous statutes. Thus, when Congress subjected any "public agency" to damages liability under the Age Discrimination in Employment Act, and separately defined "public agency" to include states, it managed to extend ADEA liability to the states—even though the extension proved unconstitutional. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73–74 (2000). So too here, when Congress subjected any "person" to damages liability under FCRA, and separately defined "person" to include "any ... government," it acted with sufficient clarity to reach federal and state governments.

FCRA also subjects covered persons to punitive damages, 15 U.S.C. § 1681n(a)(2), criminal liability, *id.* § 1681q, and civil enforcement actions by the Federal Trade Commission, *id.* § 1681s(a), and the states, *id.* § 1681s(c). According to the Fourth and Ninth Circuits, the consequences of applying these provisions to the federal government would range from implausible to absurd. So, the courts concluded, FCRA's definition of "person" must be limited to its "substantive" rather than its "enforcement" provisions. *See Robinson*, 917 F.3d at 806; *Daniel*, 891 F.3d at 770–71. But some of these consequences are hardly absurd. For instance, Congress may impose punitive damages on government entities, so long as it does so "expressly." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 n.21 (1981). And the federal government

routinely investigates itself, which is the primary mission of various Inspectors General.  As for the federal government imposing criminal liability on itself, or subjecting itself to investigation by the states, we may assume that contextual considerations would prevent application of the "person" definition as written.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (defined term "may take on distinct characters from association with distinct statutory objects").  But no such contextual considerations apply with respect to sovereign immunity, where the only interpretive constraint is that Congress waive it unambiguously.  Finally, there is no arguable basis for limiting FCRA's definition of "person" to substantive but not enforcement provisions; the definition by its terms is "applicable for the purposes of this subchapter"— *i.e.*, subchapter III, which contains the entire statute.  15 U.S.C. § 1681a(a).  So once it is conceded that "any ... government" includes the United States—which is necessary to make FCRA's substantive provisions apply to the federal government—there is no basis for denying that the same definition governs FCRA's private damages actions.

Finally, the Ninth Circuit reasoned that FCRA's statutory history counsels against reading its broad definition of "person" to effect a sovereign-immunity waiver.  *See Daniel*, 891 F.3d at 774–76.  As originally enacted in 1970, FCRA contained its current definition of "person," but imposed liability only on "[a]ny consumer reporting agency or user of information" who negligently or willfully violated the Act.  Pub. L. No. 91-508, tit. VI, §§ 616–617, 84 Stat. 1127, 1134 (1970).  So, the argument goes, the definition of "person" in the 1970 statute cannot have waived sovereign immunity.  We fail to see the relevance of that conclusion, for Congress later broadened FCRA's damages actions to run against any "person," Consumer Credit Reporting Reform Act of 1996,

Pub. L. No. 104-208, § 2412, 110 Stat. 3009-426, 3009-446, which is the text that we must construe and apply here.[1]

For these reasons, we hold that FCRA waives federal sovereign immunity from its damages claims.

## III

To qualify as a "consumer reporting agency" regulated by FCRA, a person must regularly engage "in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). The drivers contend that the Administration is a consumer reporting agency because it assembles accident and vehicle-inspection reports in the MCMIS and then furnishes them to prospective employers through the PSP. The drivers argue that the Administration violated FCRA by not using reasonable procedures to ensure the accuracy of these records, *id.* § 1681e(b), by failing to investigate the accuracy of their records upon request, *id.* § 1681i(a)(1)(A), and by failing to

---

[1] We do not share the Ninth Circuit's confidence that the 1970 statute effected no waiver of sovereign immunity. For example, the statute imposed damages liability on any "user of information" who negligently or willfully violated its terms, Pub. L. No. 91-508, tit. VI, sec. 601, §§ 616–617, 84 Stat. at 1134; it permitted consumer reporting agencies to disclose consumer reports to any "person" who the reporting agency believed intended to use the information for credit or other specified purposes, *id.* § 604(3), 84 Stat. at 1129; and it defined "person" to include any government or government agency, *id.* § 603(b), 84 Stat. at 1128. The 1970 Act thus appears to waive sovereign immunity insofar as it uses consumer information received from a credit reporting agency, though we need not definitively resolve that question.

note to prospective employers that the drivers disputed the accuracy of the citations at issue, *id.* §§ 1681c(f), 1681i(b)–(c).

In our view, the government is not a "consumer reporting agency" in its administration of the MCMIS and the PSP. For the sake of argument, we may assume that driver-safety records are "consumer reports" within the meaning of FCRA. But while the SAFE Transportation Act requires the Administration to make such records available to prospective employers, the Administration neither assembles nor evaluates the records for that purpose. To the contrary, it assembles and evaluates driver-safety records in the MCMIS, *see* 65 Fed. Reg. at 83,124–25, and does so to "support safety regulatory and enforcement activities" required by Title 49, *see* 49 U.S.C. § 31106(a)(1). The Administration thus uses MCMIS data to inform its administration of the Motor Carrier Safety Assistance Program, *see* 65 Fed. Reg. at 83,125, which provides some $300 million in annual grants to states and other jurisdictions for safety-related activities, *see* 49 U.S.C. §§ 31102, 31104. Likewise, the Administration uses MCMIS data to inform its own enforcement activity. *See* 65 Fed. Reg. at 83,124–25. It has assembled and evaluated MCMIS data for these purposes at least since 1998, *see* Pub. L. No. 105-178, sec. 4004(a), § 31106, 112 Stat. 107, 398–400 (1998)—seven years before the SAFE Transportation Act authorized the Administration to release driver-safety records to prospective employers. And the SAFE Transportation Act simply requires the release of specified "reports" that are already "contained in the Motor Carrier Management Information System"—namely accident reports, inspection reports with no driver-related safety violations, and inspection reports with serious driver-related safety violations. 49 U.S.C. § 31150(a). For these reasons, the Administration cannot fairly be described as regularly engaged in "assembling" or "evaluating" these accident and inspection reports "for the purpose of furnishing" them to the drivers' prospective employers.

The canon against surplusage reinforces our conclusion. The SAFE Transportation Act requires the Administration to satisfy four requirements before releasing MCMIS records to pre-employment screeners, and these requirements incorporate or parallel ones that FCRA already imposes on consumer reporting agencies. First, the Administration must "ensure that any information that is released" to prospective employers "will be in accordance with [FCRA] and all other applicable Federal law." 49 U.S.C. § 31150(b)(1). Second, the Administration must obtain a driver's written consent before releasing his safety records, *id.* § 31150(b)(2), which tracks FCRA's requirement that a consumer reporting agency must obtain the consumer's written consent before releasing a consumer report for employment purposes, 15 U.S.C. § 1681b(b)(1)(A)(i), (b)(2)(A)(ii). Third, the Administration must ensure that MCMIS records will be released only to the prospective employer, 49 U.S.C. § 31150(b)(3), which tracks FCRA's requirement that a consumer reporting agency must require prospective users to certify that a consumer report will be used only for authorized purposes, 15 U.S.C. § 1681e(a). Fourth, the Administration must create a procedure for drivers to correct inaccurate information in the MCMIS, 49 U.S.C. § 31150(b)(4), which tracks FCRA's requirement that credit reporting agencies use procedures to ensure the "maximum possible accuracy" of information in consumer reports, 15 U.S.C. § 1681e(b), and conduct at least a "reasonable reinvestigation" if a consumer disputes the accuracy of information in his file, *id.* § 1681i(a)(1)(A). These various requirements in the SAFE Transportation Act would have little or no effect if the Administration were already a "consumer reporting agency" covered by FCRA. To be sure, the SAFE Transportation Act contains at least a bit of surplusage insofar as it incorporates "other applicable Federal law" besides FCRA. 49 U.S.C. § 31150(b)(1). But one short, unavoidably redundant catchall phrase is a far cry from what the plaintiffs'

position implies—the pointless incorporation into the SAFE Transportation Act of one FCRA requirement after another.

In contrast, our interpretation gives meaningful effect to the four FCRA-related conditions in the SAFE Transportation Act. Specifically, they oblige the Administration to act "in accordance with" FCRA provisions regarding the release of information and to follow three other requirements tracking those of FCRA. On this understanding, the Administration's release of the drivers' safety records may well have violated the SAFE Transportation Act, though not FCRA itself. Any such violation of the SAFE Transportation Act may, in an appropriate case, be redressable through the APA. But here, we have already held that the drivers lack standing to seek prospective relief under the APA, as the disputed records have already been removed from the MCMIS. *See Owner-Operator Indep. Drivers*, 879 F.3d at 346–47. And a violation of section 31150 could not itself support the money damages sought by the drivers, for the SAFE Transportation Act contains no arguable waiver of sovereign immunity.

For these reasons, we hold that the government did not become a "consumer reporting agency" under FCRA through its administration of the MCMIS database and the PSP disclosure program. We thus affirm the dismissal of the drivers' damages claims under FCRA.

IV

The remaining issue is whether the district court permissibly denied the drivers' July 2018 motion to amend their complaint to add Privacy Act claims. Federal Rule of Civil Procedure 15(a)(2) provides that a district court "should freely" allow amendment "when justice so requires." But the decision whether to permit amendment is "vested in the sound discretion of the trial court," *Doe v. McMillan*, 566 F.2d 713,

720 (D.C. Cir. 1977), which can deny leave to amend based on either "undue delay" by the moving party or "undue prejudice" to the other side, *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In this case, the district court permissibly denied leave to amend. We have consistently held that undue delay is a valid ground for denying leave to amend, *see*, *e.g.*, *Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir. 2012); *Doe*, 566 F.2d at 720, especially when the plaintiff offers "no good reason" for the delay, *Trudel v. SunTrust Bank*, 924 F.3d. 1281, 1288 (D.C. Cir. 2019). Here, the drivers offer no explanation why they raised Privacy Act claims in their opening complaints, omitted them from their consolidated complaint, and then waited four years before raising the claims anew. The drivers instead argue that undue delay cannot support a denial of leave to amend without a further showing of prejudice. We need not decide whether such a showing is always required, for we agree with the district court that, in this case, the drivers waived their Privacy Act claims. The district court reasonably concluded that "if an amended complaint omits claims raised in the original complaint, the plaintiff has waived those omitted claims." *Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001). And excusing such a waiver here would both eliminate a defense to liability and oblige the Administration to continue litigating a case that has already run for nine years. That is more than enough to deny amendment.

We recognize that the district court, in denying the first motion to amend, remarked that the drivers could later add a Privacy Act claim. *Owner-Operator Indep. Drivers*, 316 F. Supp. 3d at 206. The drivers argue that this remark bound the court going forward. But a court may "modify or rescind its orders at any point prior to final judgment in a civil case." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016). Here, the district court changed course long before final judgment, then

reasonably explained its revised position.  Changing course in this way did not violate any law of the case.

## V

The district court properly dismissed the drivers' complaint and permissibly denied their July 2018 motion for leave to amend.

*Affirmed.*

KATSAS, *Circuit Judge*, concurring:  The Court's opinion in this case proceeds in conventional fashion by deciding, first, that the Fair Credit Reporting Act waives the federal government's sovereign immunity from claims for money damages and, second, that the FCRA claims asserted against the government here lack merit.  Judge Randolph criticizes us for deciding the sovereign-immunity question unnecessarily.  I write separately to explain my view that because the sovereign-immunity question goes to our jurisdiction, we must decide it before reaching the merits.

I

In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court famously and emphatically confirmed that a federal court, before it resolves the merits of a case, must first conclude that it has jurisdiction to do so.  *Id.* at 93–102.  This requirement, which rests on a "long and venerable line of our cases," arises from "'the nature and limits of the judicial power'" and is "'inflexible and without exception.'"  *Id.* at 94–95 (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).  Because jurisdiction is the "power to declare the law," a court without jurisdiction "cannot proceed at all in any cause."  *Id.* at 94 (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).  A court with only possible or hypothetical jurisdiction "produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion."  *Id.* at 101.

The Supreme Court held in *FDIC v. Meyer*, 510 U.S. 471 (1994), that "[s]overeign immunity is jurisdictional in nature."  *Id.* at 475.  The Court thought it "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  *Id.* (quoting *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).  Likewise, "the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit."  *Id.* (cleaned up) (quoting *United States v. Sherwood*, 312

U.S. 584, 586 (1941)). "Therefore," before reaching the merits of a suit for damages against the federal government, a court "must first decide" whether Congress has waived the government's sovereign immunity. *Id. Meyer* proceeded to hold that Congress had waived the government's immunity on the claims at issue, *id.* at 475–83, and then to reject the claims on their merits, *id.* at 483–86.

After *Meyer*, our court has four times held that we must find a waiver of sovereign immunity before reaching the merits of claims against the federal government. In *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006), we cited *Steel Co.* for the proposition that we "must" begin with the "issue of jurisdiction," we described federal sovereign immunity as "jurisdictional" for that purpose, and we reached the merits only after resolving the disputed immunity question. *Id.* at 1214–16. In *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006), we ranked as "'jurisdictional'" the question "whether the United States has waived its sovereign immunity," and we reached the merits only after "[h]aving concluded that there is jurisdiction." *Id.* at 185–87 (quoting *Meyer*, 510 U.S. at 475). In *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017), we held that *Steel Co.*'s "obligation to assure ourselves we have jurisdiction" at the outset "extends to sovereign immunity because it is 'jurisdictional in nature.'" *Id.* at 619 (quoting *Meyer*, 510 U.S. at 475). In *Sierra Club v. Wheeler*, 956 F.3d 612 (D.C. Cir. 2020), we held that "[b]ecause sovereign immunity is 'jurisdictional in nature,' we must assure ourselves that the Sierra Club's claims fall within a valid waiver of sovereign immunity before allowing the suit to proceed." *Id.* at 616 (quoting *Meyer*, 510 U.S. at 475). We have also treated federal sovereign immunity as jurisdictional in other respects. We have raised the issue *sua sponte*. *See Perry Capital*, 864 F.3d at 619; *Trudeau*, 456 F.3d at 185; *Rochon*, 438 F.3d at 1215–16. And we have held that an agency's appearance in court does not waive its sovereign

immunity because "officers of the United States possess no power … to confer jurisdiction on a court in the absence of some express provision of Congress." *Dep't of Army v. FLRA*, 56 F.3d 273, 275 (D.C. Cir. 1995) (quoting *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 660 (1947)).

This analysis accords with the treatment of state sovereign immunity. Federal and state sovereign immunity derive from the same source—the centuries-old view that no sovereign may "be sued without its consent," which was "universal in the States when the Constitution was drafted and ratified." *Alden v. Maine*, 527 U.S. 706, 715–16 (1999). Before ratification, states enjoyed this immunity as "fully sovereign nations," *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493–95 (2019)— as the United States does today. States still largely enjoy the same immunity, insofar as sovereign immunity "limits the grant of judicial authority in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). Likewise, the Eleventh Amendment, which sought "to restore the original constitutional design" regarding sovereign immunity, *Alden*, 527 U.S. at 722, speaks in expressly jurisdictional terms, U.S. Const. amend. XI (limiting scope of the federal "Judicial power" to entertain suits against states). And because state sovereign immunity imposes a "jurisdictional restriction" on the federal courts, it must be "given priority" under *Steel Co. Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778–80 (2000).

Our treatment of foreign sovereign immunity is also instructive. The Foreign Sovereign Immunities Act grants foreign sovereigns immunity "from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, except as provided by exceptions in the FSIA itself, *see id.* §§ 1605–1607. Accordingly, we must resolve assertions of foreign sovereign immunity "[a]t the threshold of every action," before the merits. *Verlinden B.V. v. Cent. Bank of*

4

*Nigeria*, 461 U.S. 480, 493–94 (1983); *Process & Ind. Dev. Ltd. v. Fed. Repub. of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020).

II

Against all this, Judge Randolph invokes *In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.C. Cir. 1999) (per curiam). There, we held that because federal sovereign immunity "can be waived," it is a "less than pure jurisdictional question," which "need not be decided before [the] merits." *Id.* at 1000–01 (cleaned up). The primary authority we cited was *United States ex rel. Long v. SCS Business & Technical Institute, Inc.*, 173 F.3d 890 (D.C. Cir. 1999), which we read to hold that Eleventh Amendment immunity "need not be decided before the merits." 192 F.3d at 1000.

How to handle this clear conflict among our precedents? We have held that "when a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail." *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). Moreover, if an earlier *circuit* precedent prevails over later inconsistent circuit precedents, then so too must an earlier *Supreme Court* precedent. *Thompson v. Dallas City Attorney's Office*, 913 F.3d 464, 467–68 (5th Cir. 2019). And *Sealed Case* conflicts with prior Supreme Court precedent: whereas *Meyer* held that federal sovereign immunity is a "jurisdictional" issue that we "must first decide" before reaching the merits, 510 U.S. at 475, *Sealed Case* held that federal sovereign immunity is only "quasi-jurisdictional" and so "we are not required to decide [it] before the merits," 192 F.3d at 1000–01. Later

panels of this Court were thus correct to follow *Meyer* over *Sealed Case*, and we should do the same.[1]

Moreover, later Supreme Court decisions have "eviscerated" the reasoning of *Sealed Case*, which separately makes it no longer binding. *See Dellums v. NRC*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988). *Sealed Case* held that federal sovereign immunity is a "less than pure jurisdictional question"—and thus not subject to *Steel Co.*—because Congress can waive it. 192 F.3d at 1000. But in that respect, federal sovereign immunity is like two other waivable but jurisdictional questions: Eleventh Amendment immunity, which *Sealed Case* discussed, and personal jurisdiction, *see Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 394 (1998) (Kennedy, J., concurring) ("the hybrid nature of the jurisdictional bar erected by the Eleventh Amendment ... bears substantial similarity to personal jurisdiction requirements, since it can be waived"); Baude & Sachs, *The Misunderstood Eleventh Amendment*, 169 U. Penn. L. Rev. 609, 625 (2021); Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559, 1574–79 (2002). After we decided *Sealed Case*, the Supreme Court made clear that Eleventh Amendment immunity *is* a threshold jurisdictional issue for purposes of *Steel Co.*, *see Vt. Agency*, 529 U.S. at 778–80, even though states can waive it. Likewise, the Court has held that personal jurisdiction, though waivable, ranks as jurisdictional under *Steel Co. Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999). Later, the Court confirmed

---

[1] Judge Randolph dismisses *Meyer* as unreasoned dicta. *Post* at 6. But the Supreme Court made clear what it meant: "Sovereign immunity is jurisdictional in nature," and, "[t]herefore, we must first decide" it. *Meyer*, 510 U.S. at 475. The Court proceeded to resolve a sovereign-immunity question against the government, only then to rule for the government on the merits, *id.* at 475–83—precisely our disposition in this case.

the corollary proposition that a federal court "may not rule on the merits of a case without first determining that it has" both "subject-matter" and "personal jurisdiction." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). After these intervening decisions, it is no longer possible to maintain that courts may skip over federal sovereign immunity simply because Congress can waive it.[2]

---

[2] The law of other circuits tugs in different directions. At least five other circuits have treated federal sovereign immunity as a threshold jurisdictional issue. *See Montilla v. Fed. Nat'l Mortg. Ass'n*, 999 F.3d 751, 758 (1st Cir. 2021) (sovereign immunity is "a threshold jurisdictional question"); *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011) (sovereign immunity "can be raised at any time by the government, as it goes to a court's jurisdiction"); *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005) ("Because a finding of sovereign immunity would deprive this court of subject matter jurisdiction, we address that question first …."); *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999) ("Sovereign immunity … is a jurisdictional threshold matter and it is well-established that questions of subject matter jurisdiction can be raised for the first time on appeal."); *Antol v. Perry*, 82 F.3d 1291, 1297 (3d Cir. 1996) ("the district court first should have considered whether Congress unequivocally expressed a waiver of sovereign immunity" because it "is jurisdictional in nature" (cleaned up)). Judge Randolph highlights circuit decisions coming out the opposite way, *see post* at 5 n.7 & 12–17, though he overstates the extent of support for his view by including in his addendum cases decided before *Steel Co.*, cases skipping over sovereign immunity without addressing the sequencing question, cases skipping over sovereign immunity to decide another jurisdictional question, and unpublished decisions. The fairest summary of all the caselaw appears in one of the decisions that he cites: "We have not spoken with one voice on whether we must, or whether we may, resolve a sovereign-immunity defense before addressing the merits." *Nair v. Oakland Cty. Comm. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006).

## III

More broadly, Judge Randolph contends that *Steel Co.* imposes no sequencing rule for *any* question of statutory as opposed to constitutional jurisdiction. *Post* at 1–4. But *Steel Co.* says the opposite, as does most of our precedent.

## A

As a conceptual matter, it makes little sense, in distinguishing between jurisdiction and the merits, to differentiate constitutional and statutory jurisdiction. Article III imposes two limitations on the jurisdiction of the federal courts. First, "[t]he judicial Power of the United States" extends only to the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. Art. III, § 1. It is hornbook law that Congress's power to establish inferior courts includes the power to "define their respective jurisdictions." *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448 (1850). Second, "[t]he judicial Power" extends only to certain "Cases" and "Controversies." U.S. Const. Art. III, § 2. Both limitations arise from the same, explicitly jurisdictional reference to the federal "judicial Power." And nothing in Article III suggests that the jurisdictional rules established under section 1 are of lesser kind than those created by section 2. Because Article III itself does not impose a hierarchy of jurisdictional issues, we should not either. *See Kaplan v. Cent. Bank of the Islamic Repub. of Iran*, 896 F.3d 501, 517 (D.C. Cir. 2018) (Edwards, J., concurring) ("The distinction between statutory limitations on subject-matter jurisdiction and other Article III jurisdictional limitations is tenuous, as both limitations arise from Article III.").

Nor did *Steel Co.* draw that distinction. Although the jurisdictional question presented there involved the case-or-controversy requirement of Article III, the Court's reasoning was not so limited. In holding that federal courts must decide

8

jurisdictional issues before merits ones, *Steel Co.* described jurisdictional issues as ones involving "power to declare the law" or "the nature and limits of the judicial power of the United States." 523 U.S. at 94–95 (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) at 514, and *Mansfield*, 111 U.S. at 382). On that understanding, it makes no difference whether the resolution of a jurisdictional issue depends on Article III or a federal statute. Moreover, the canonical cases cited in *Steel Co.* for the proposition that jurisdictional issues must be decided first presented only questions of *statutory* jurisdiction: *Ex parte McCardle* involved a statute that stripped away jurisdiction otherwise provided by Article III, *see* 74 U.S. (7 Wall.) at 512–13, and *Mansfield* involved the statutory requirement of complete diversity of citizenship, *see* 111 U.S. at 380–82.[3] Finally, in summing up its holding, *Steel Co.* referenced both statutory and constitutional jurisdiction: "The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects." 523 U.S. at 101.

This Court repeatedly has held that, under *Steel Co.*, we "must" decide questions of statutory jurisdiction before the merits. *In re Sealed Case*, 449 F.3d 118, 121 (D.C. Cir. 2006). We have done so in cases involving statutory jurisdiction over a sentencing appeal, *id.*; statutory jurisdiction under the Tucker Act, *Rochon*, 438 F.3d at 1214 ("We begin, as we must, with the issue of jurisdiction."); statutory jurisdiction under the Hobbs Act, *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251,

---

[3] The parties in *Mansfield* were minimally but not completely diverse, *see* 111 U.S. at 380–82, and the requirement of complete diversity arises by statute, *see Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806).

1264 (D.C. Cir. 2004) ("Before addressing the merits … we must consider two jurisdictional issues."); habeas jurisdiction under 28 U.S.C. § 2253, *Madley v. U.S. Parole Comm'n*, 278 F.3d 1306, 1308 (D.C. Cir. 2002) ("As the question affects our power to consider this appeal, we must consider it before the merits." (cleaned up)); and finality under 28 U.S.C. § 1291, *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 348 (D.C. Cir. 2007) ("Before we can consider the merits of Exxon's political question arguments, we must determine whether we have jurisdiction."); *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 880 (D.C. Cir. 2000) ("Because this court may not proceed without appellate jurisdiction, we must address the motion to dismiss before considering the arguments on the merits."). Similarly, in *Coalition for Fair Lumber Imports v. United States*, 471 F.3d 1329 (D.C. Cir. 2006), we held that "statutory jurisdiction" is a "jurisdictional" issue under *Steel Co.*, which permitted us to decide it without reaching another jurisdictional question about Article III mootness. *Id.* at 1332–33.

B

Again, we confront conflicting precedents. In the decisions discussed above, we held that we must decide questions of statutory jurisdiction before the merits. On the other hand, *Kramer v. Gates*, 481 F.3d 788 (D.C. Cir. 2007), held that the "absolute priority" rule of *Steel Co.* governs only "issues related to Article III jurisdiction" and does not prohibit "addressing the merits where doing so [makes] it possible to avoid a doubtful issue of *statutory* jurisdiction." *Id.* at 791. Since then, we have twice applied *Kramer* without further analysis. *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1246 (D.C. Cir. 2020) ("The law of our circuit allows a court to assume hypothetical *statutory* jurisdiction even if we cannot assume Article III jurisdiction."); *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728 (D.C. Cir. 2008) ("*Steel Co.* requires

that we prioritize the jurisdictional issue only when the existence of *Article III* jurisdiction is in doubt").

To harmonize these competing case lines, I would again return to *Meyer*, which specifically held that federal courts "must first decide" federal sovereign immunity before reaching the merits. 510 U.S. at 475. Whatever rule might govern statutory-jurisdiction questions besides those bearing on federal sovereign immunity, no circuit decision could abrogate the Supreme Court's specific holding on that point. Moreover, earlier circuit decisions control over later ones, and at least six pre-*Kramer* decisions squarely require federal courts to resolve questions of statutory jurisdiction before the merits. Finally, as explained below, subsequent Supreme Court decisions have eviscerated *Kramer*.

*Kramer* relied on the second footnote of *Steel Co.*, which stated that sometimes "a merits question can be given priority over a statutory standing question." 523 U.S. at 97 n.2. *Kramer* equated the phrase "statutory standing" with "statutory jurisdiction," then made the sweeping conclusion that courts may decide the merits before any question of statutory jurisdiction. 481 F.3d at 791. But after *Kramer* was decided, the Supreme Court clarified that the term "statutory standing" means the traditional zone-of-interests requirement, which asks "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (citing *Steel Co.*, 523 U.S. at 97 n.2). *Lexmark* further noted that the term "statutory standing" is misleading, "since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Id.* at 128 n.4 (cleaned up). So in concluding that a court may decide the "merits" question "whether *any* plaintiff has a cause of action under the statute" at issue before deciding the so-called

"statutory standing" question "whether *this* plaintiff has a cause of action," *Steel Co.*, 523 U.S. at 97 n.2, the Supreme Court was simply allowing one merits question to be decided before another.[4]  After *Lexmark*, there is no basis for reading the footnoted reference to "statutory standing" as encompassing all questions of statutory jurisdiction.[5]

*Sinochem* further undercuts *Kramer*.  That case reiterated the holding of *Ruhrgas* that federal courts may decide questions of personal jurisdiction before questions of subject-

---

[4]  That is exactly what happened in *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453 (1974), where the Court decided the merits question "whether a statutory cause of action existed" before considering the "statutory standing" question whether the plaintiff came within its "zone of interests."  *See Steel Co.*, 523 U.S. at 97 & n.2 (discussing *National Railroad*).

[5]  In clarifying that "statutory standing," "prudential standing," and "cause of action" are all merits questions, *Lexmark* highlights another question noted in footnote 2 of *Steel Co.*: how can "statutory standing" questions (about the merits) ever "be given priority over an Article III question"?  523 U.S. at 97 n.2.  *Vermont* answers that question.  There, the Court held that the merits question whether a statutory cause of action runs against the states may be decided before the "jurisdictional" question whether the Eleventh Amendment would bar the claim.  *See* 529 U.S. at 779–80.  The Court explained that only "[t]he combination of logical priority and virtual coincidence of scope makes it possible," as between these two questions, "to decide the statutory issue first."  *Id.*  Logical priority, because the question whether a statute purports to authorize some claim against a state is analytically prior to the question whether the Eleventh Amendment would prohibit it.  And virtual coincidence, because deciding the statutory merits question would not "expand the Court's power beyond the limits that the jurisdictional restriction has imposed."  *Id.* at 779.  This reasoning does not suggest that any question of statutory jurisdiction may be decided first.

matter jurisdiction. 549 U.S. at 430–31. In *Ruhrgas*, the only disputed question of subject-matter jurisdiction was one involving "the complete diversity required by 28 U.S.C. § 1332, but not Article III." 526 U.S. at 584 (cleaned up). Yet in *Sinochem*, the Court treated that *statutory* question as one that, like personal jurisdiction, must be decided before the merits. 549 U.S. at 431. For these reasons, I agree with Judge Edwards that *Lexmark* and *Sinochem* have substantially undercut the *Kramer* line of cases. *See Kaplan*, 896 F.3d at 520 (Edwards, J., concurring) ("At an appropriate opportunity, the court should consider whether, in light of *Sinochem* and *Lexmark*, the *Kramer*/*Chalabi* distinction between statutory and Article III jurisdictional issues can be sustained.").[6]

## IV

Finally, Judge Randolph opines on the history of sovereign immunity. In his view, because the existence of immunity was an open question at the Founding, and because the Supreme Court decided merits questions before sovereign-immunity

---

[6] The other precedents that Judge Randolph cites are inapposite. *Post* at 3 & n.4. *Thomas v. Network Solutions, Inc.*, 176 F.3d 500 (D.C. Cir. 1999), skipped over the question whether a government contractor should receive antitrust immunity, not sovereign immunity. *Id.* at 507–10. *Sherrod v. Breitbart*, 720 F.3d 932 (D.C. Cir. 2013), assumed appellate jurisdiction under *Norton v. Matthews*, 427 U.S. 524 (1976), which did the same only because its "merits question was decided *in a companion case*," *Steel Co.*, 523 U.S. at 98 (describing *Norton*, 427 U.S. at 530–31). *Lin v. United States*, 690 F. App'x 7 (D.C. Cir. 2017), is unpublished. And *United States ex rel. Long v. SCS Business & Technical Institute*, 173 F.3d 890 (D.C. Cir. 1999), anticipated *Vermont* in holding that courts may decide whether a statutory cause of action runs against states before deciding whether the Eleventh Amendment would bar the cause of action if it did. *See id.* at 893–98. As shown above in note 5, that is entirely consistent with my take on *Steel Co.*

questions through the twentieth century, we should not read *Meyer* to curtail that longstanding discretion. *Post* at 6–11. But even putting aside that *Meyer* says what it says, Judge Randolph gets the history wrong. Far from inventing a novel rule, *Meyer* applied an understanding of sovereign immunity that predates the Founding.

A

"[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified." *Alden*, 527 U.S. at 715–16. In the Founders' view, it derived from both the common law and the law of nations. *Franchise Tax Bd.*, 139 S. Ct. at 1493. Under the common law, "no suit or action [could] be brought against the king, even in civil matters, because no court [could] have jurisdiction over him." 1 W. Blackstone, *Commentaries* \*235; *see also Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 437–46 (1793) (Iredell, J., dissenting) (collecting English authorities); 1 F. Pollock & F. Maitland, *History of English Law* 518 (2d ed. 1898) (the king "cannot be compelled to answer in his own court"). And under the law of nations, the sovereign was "exempt[] ... from all [foreign] jurisdiction." 4 E. de Vattel, *The Law of Nations* 486 (J. Chitty ed. 1835).[7]

---

[7] Judge Randolph protests that English subjects could obtain relief against the Crown. *Post* at 7. But as Blackstone explains, this relief depended on the Crown's consent, "not upon compulsion," 1 Blackstone, *supra*, at \*236, which is consistent with how *Alden* described the "universal" doctrine of sovereign immunity, *see* 527 U.S. at 715–16. Judge Randolph identifies the specific procedures of *traverse* and *monstrans de droit*, which allowed subjects to avoid certain "delays incident to a petition of right." 9 W. Holdsworth, *A History of English Law* 25–26 (3d ed. 1944). Both are consistent with sovereign immunity: for one thing, they were procedures enacted by statute, indicating at most a waiver of sovereign

During the ratification debates, leading Federalists were adamant that the Constitution did not abrogate this settled background rule. Alexander Hamilton wrote in *The Federalist* that it "is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *The Federalist* No. 81. James Madison affirmed in the Virginia ratifying convention that it was "not in the power of individuals to call any state into court." 3 *Debates on the Federal Constitution* 533 (J. Elliot ed., 2d ed. 1854). And John Marshall, speaking soon after Madison, concurred that it was "not rational to suppose that the sovereign power should be dragged before a court." *Id.* at 555. Leading Anti-Federalists agreed that sovereigns were not properly "subject[] . . . to answer in a court of law, to the suit of an individual." *See*, *e.g.*, Brutus No. 13 (Feb. 21, 1788), *in* 4 *The Founders' Constitution* 238 (P. Kurland & R. Lerner eds. 1987).

The reaction to *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), reflected this consensus. When four Justices read Article III to allow a citizen of South Carolina to sue the State of Georgia without its consent, the decision "fell upon the country with a profound shock." 1 C. Warren, *The Supreme Court in United States History* 96 (rev. ed. 1926). In little more than two months, Congress approved the Eleventh Amendment with near unanimity in both Houses. *See Alden*, 527 U.S. at 721. Within two years, the states ratified it and thereby "overruled the Court." *Id.* at 723. In doing so, they "acted not to change but to restore the original constitutional design." *Id.* at 722; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 69 (1996) (*Chisolm* "was contrary to the well-understood meaning of the Constitution").

---

immunity; for another, relief under them still required sending a case "before the king to make a final discussion." *See id.*

While most Founding-era discussions of sovereign immunity addressed the states, the immunity of the United States was understood even more clearly. As *Alden* explained, "the sovereign's right to assert immunity from suit in its own courts was a principle so well established that no one conceived it would be altered by the new Constitution." 527 U.S. at 741. The United States fell squarely within this background rule, as it was supreme over the states within its sphere of operation, U.S. Const. Art. VI, cl. 2. Thus, even justices in the *Chisholm* majority recognized that Article III preserved *federal* sovereign immunity. *Chisholm*, 2 U.S. (2 Dall.) at 469 (Cushing, J.) (expressing "doubt" that the "United States may be sued by a citizen of any of the States"); *id.* at 478 (Jay, C.J.) (raising an "important difference" between suits against states and suits against the United States). For these reasons, Chief Justice Marshall could describe the rule that "no suit can be commenced or prosecuted against the United States" as "universally received opinion." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12 (1821).

B

The Framers also regarded sovereign immunity as jurisdictional. Then as now, a justiciable case required adverse "parties to come into court, who can be reached by its process, and bound by its power." 10 Annals of Cong. 606 (1800) (remarks of then-Representative John Marshall); *see also Borden v. Fitch*, 15 Johns. 121, 141 (N.Y. Sup. Ct. 1818) ("To give any binding effect to a judgment, it is essential that the Court should have jurisdiction of the person."). Immunity enabled a defendant sovereign to frustrate this requirement—Madison and Marshall asserted that no party could "call" or "drag[]" a sovereign into court. 3 *Debates*, *supra*, at 533, 555. Blackstone described sovereign immunity as a bar to "jurisdiction," which "implies superiority of power." 1 Blackstone, *supra*, at *235. And Hamilton acknowledged that

a sovereign could be sued "with[] its consent." The Federalist No. 81. From the beginning, sovereign immunity thus concerned the power to hale a particular party into court, or what we now call personal jurisdiction. *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2264 (2021) (Gorsuch, J., dissenting) ("Structural [sovereign] immunity sounds in personal jurisdiction …."); Nelson, *supra*, at 1565–66 & n.23; Baude & Sachs, *supra*, at 625.

This understanding fills the United States Reports. In *United States v. Clarke*, 33 U.S. (8 Pet.) 436 (1834), Chief Justice Marshall remarked that a court "cannot exercise jurisdiction over" a suit against the United States unless it falls "within the authority of some act of [C]ongress." *Id.* at 444. And in later cases, the Court regularly described the government's consent to be sued as a prerequisite to jurisdiction. *See*, *e.g.*, *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940) ("Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void."); *Haycraft v. United States*, 89 U.S. 81, 92 (1874) ("To our minds the question is one of jurisdiction. A sovereign cannot be sued in his own courts except with his consent."); *United States v. McLemore*, 45 U.S. (4 How.) 286, 288 (1846) ("There was no jurisdiction of this case in the Circuit Court, as the government is not liable to be sued, except with its own consent.").

*Meyer* reasoned from this foundation. As *Steel Co.* recounted, a "long and venerable line of our cases" had held that courts must confirm their own jurisdiction before resolving the merits of a case. 523 U.S. at 94–95. And in *Meyer* itself, the Court held that federal sovereign immunity was "jurisdictional" because the "terms of the United States' consent to be sued in any court define that court's jurisdiction," and because "the United States may not be sued without its consent." 510 U.S. at 475 (quoting *Sherwood*, 312 U.S. at 586,

and *Mitchell*, 463 U.S. at 212 (cleaned up)).  This reasoning followed Hamilton, Madison, and Marshall in viewing sovereign immunity as effectively a rule of personal *jurisdiction*.  *Meyer* thus combined two legal principles that date back to the Founding—first, that federal courts must begin with their own jurisdiction and, second, that sovereign immunity is jurisdictional—to conclude that federal courts must begin with sovereign immunity.  The brevity of the Court's opinion reflects not its novelty, but its bedrock nature.[8]

C

Judge Randolph identifies some early cases that decided the merits before sovereign immunity.  *Post* at 10–11.  But his nineteenth-century cases involved ejectment actions brought against federal *officials*.  *United States v. Lee*, 106 U.S. (16 Otto) 196, 196–97 (1882) ("the United States was not a party"); *Grisar v. McDowell*, 73 U.S. (6 Wall.) 363, 369–70 (1868); *Brown v. Huger*, 62 U.S. (21 How.) 305, 308–09 (1858);

---

[8] The resemblance between sovereign immunity and personal jurisdiction is admittedly imperfect.  But to the degree that sovereign immunity is unlike personal jurisdiction, it is instead like subject-matter jurisdiction.  *See Schacht*, 524 U.S. at 394–95 (Kennedy, J., concurring).  For instance, the Eleventh Amendment concerns the "Judicial power," U.S. Const. amend. XI, which suggests a limit of subject-matter jurisdiction.  Similarly, the Supreme Court has held that sovereign immunity may be asserted for the first time on appeal, *Edelman v. Jordan*, 415 U.S. 651, 678 (1974)—a rule that generally applies to questions of subject-matter jurisdiction, *Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126, 127 (1804), but not personal jurisdiction, *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–04 (1982).  This resemblance between sovereign immunity and subject-matter jurisdiction does not affect the ordering question before us, for courts must decide both personal and subject-matter jurisdiction before the merits.  *See Sinochem*, 549 U.S. at 430–31.

*Wilcox v. Jackson*, 38 U.S. (13 Pet.) 498, 509 (1839). As the Court later explained, these cases stand only for the proposition that federal officials may be "sued individually as trespassers." *Belknap v. Schild*, 161 U.S. 10, 19 (1896). Moreover, only one of the cases even mentioned sovereign immunity, and it did so without considering whether the immunity was jurisdictional, much less whether anything turned on that question. *See Lee*, 106 U.S. (16 Otto) at 204–23. Judge Randolph does identify two twentieth-century cases where the Supreme Court resolved the merits while reserving a question of sovereign immunity. *United States v. Mitchell*, 445 U.S. 535, 546 & n.7 (1980); *Rabinowitz v. Kennedy*, 376 U.S. 605, 607 (1964). But neither decision offered any reasoning for doing so. On the question of sequencing, these two decisions thus qualify as "drive-by jurisdictional rulings" entitled to "no precedential effect." *Steel Co.*, 523 U.S. at 91. Likewise, they establish no practice long or settled enough to have interpretive significance. And their utter silence on the sequencing question certainly does not trump the Supreme Court's later, reasoned holding on that very point in *Meyer*.[9]

Judge Randolph also argues that English common-law courts did not apply any ordering rule regarding sovereign

---

[9] Judge Randolph mentions two inapposite decisions. In *United States ex rel. Goldberg v. Daniels*, 231 U.S. 218 (1913), the Supreme Court ruled for the government on sovereign immunity, which it described as "earlier in point of logic" than the merits. *Id.* at 221–22. *Califano v. Boles*, 443 U.S. 282 (1979), involved a denial of benefits under the Social Security Act, an action that fell comfortably within both the judicial-review provision in 28 U.S.C. § 405(g) and the waiver of sovereign immunity for claims "seeking relief other than money damages" in 5 U.S.C. § 702. The unaddressed immunity question concerned not whether the Court could reach the merits, but only a dispute about the available remedy if the claimant had prevailed on the merits. *See* 443 U.S. at 296–97.

immunity. *Post* at 7–8. But the requirement that federal courts begin with their jurisdiction stems from the plain text of the Constitution, which specifically limits the federal "judicial Power" to certain courts, U.S. Const. Art. III, § 1, and certain cases or controversies, *id.* § 2. English law, which lacked a written constitution and allowed common-law courts to "regulate[]" their own jurisdiction, *see Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93 (1807), had no cause for a comparable sequencing rule. And none of the Supreme Court's sequencing decisions, including its comprehensive opinion in *Steel Co.*, even considered English law. So it is hard to see how a decision from the Exchequer Chamber, which did not address sequencing at all, could trump the express holding of *Meyer* and two hundred years of American law that support it.

## V

Finally, a word about prudence. Judge Randolph thinks that because the merits questions in this case are straightforward, it would be sensible to skip over the circuit-splitting question whether FCRA waives federal sovereign immunity. *Post* at 1. But the anterior sequencing question—whether we must decide the sovereign-immunity question first—is itself more complex than the sovereign-immunity question, as my back-and-forth with Judge Randolph makes clear. Moreover, as shown above, the sequencing question implicates two distinct conflicts within our own precedent, as well as deep inter-circuit confusion over whether sovereign immunity is jurisdictional. So regardless of whether I am right about *Steel Co.* and *Meyer*, the Court sensibly avoids that question by resolving sovereign immunity first. For while reasonable jurists may debate whether we *must* decide sovereign immunity first, all agree that we *may* do so.

RANDOLPH, *Senior Circuit Judge*, concurring in part and concurring in the judgment,

My colleagues conclude first that the governing statute waives the sovereign immunity of the Federal Motor Carrier Safety Administration. Then they tell us that the statute waiving sovereign immunity does not apply to this federal agency — and so the plaintiffs lose.

One may wonder how it can be that a statute waives the sovereign immunity of a federal agency when the statute does not even apply to the agency? This is a puzzle about which I express no opinion. As I see it, the court should not have exercised its discretion to decide the question of sovereign immunity first. There is a circuit split on whether this federal agency has immunity[1] and, given the panel's conclusion that the plaintiffs have no cause of action — with which I agree — I think it was improper to take a position on that question.

I.

The major premise of Judge Katsas's concurring opinion is that a federal court must always satisfy itself that it has statutory jurisdiction before it may reach the merits. The rest of his concurring opinion is devoted to demonstrating that sovereign immunity is a matter of jurisdiction.

As I see it, his premise is wrong and so the rest of his concurring opinion does not matter. Even if sovereign immunity is jurisdictional (it is not),[2] Supreme Court decisions and

---

[1] *Compare Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014), *with Daniel v. Nat'l Park Serv.*, 891 F.3d 762 (9th Cir. 2018), *and Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799 (4th Cir. 2019).

[2] It "overstates the strength" of immunity to "analogize it to a lack of jurisdiction," as Judge Easterbrook aptly explained in *United*

decisions of this court hold in the clearest possible terms that there is no rigid rule requiring a federal court to decide statutory jurisdiction (as distinguished from Article III jurisdiction) before getting to the merits.

Consider *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453 (1974)*.* The Court first decided that the plaintiffs did not have a cause of action. Only then did the Court explain: "Since we hold that no right of action exists, questions of [statutory] standing *and jurisdiction* became immaterial." 414 U.S. at 465 n.13 (italics added). The Court thus made clear that a merits question can be decided before a statutory jurisdiction question. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 96-97 & n. 2 (1998), while holding that "a merits question cannot be given priority over an Article III question," reaffirmed *National Railroad*.[3] In dissent, Justice Stevens relied on *National*

*States v. County of Cook*, 167 F.3d 381, 388 (7th Cir. 1999). After all, federal sovereign immunity concerns "not the competence of the court to render a binding judgment, but the propriety of interpreting a given statute to allow particular relief." *Id.* at 389. And the Supreme Court has clarified that rules "should not be referred to as jurisdictional" unless they govern a court's "subject-matter or personal jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). "Other rules, even if important and mandatory . . . should not be given the jurisdictional brand." *Id.*

[3] As Justice Breyer put it in his *Steel Co.* concurring opinion, "[t]his Court has previously made clear that courts may 'reserv[e] difficult questions of . . . jurisdiction when the case alternatively could be resolved on the merits in favor of the same party.' *Norton v. Mathews*, 427 U.S. 524, 532 (1976). That rule makes theoretical sense [and] enormous practical sense." 523 U.S. at 111 (Breyer, J., concurring).

*Railroad* and argued — as does Judge Katsas in his concurring opinion here — that it was not logical to treat statutory questions of jurisdiction differently than Article III case-or-controversy questions. 523 U.S. at 120 & n. 12. The Court rejected Justice Stevens' argument. *Id.* at 97 n. 2.

Judge Katsas draws an analogy to the Supreme Court's "treatment of state sovereign immunity." *Ante*, at 3. But the analogy refutes his position. A few years after *Steel Co.* the Court acknowledged with approval that it had "routinely addressed *before* the question whether the Eleventh Amendment forbids a particular statutory cause of action to be asserted against States, the question whether the statute itself *permits* the cause of action it creates to be asserted against States (which it can do only by clearly expressing such an intent)." *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 779 (2000). It is worth noting that Justice Scalia, the author of the Court's *Steel Co.* opinion, also wrote the Court's opinion in *Vermont Agency*.

Our court therefore has determined that *Steel Co.* is limited to Article III jurisdiction and that the Supreme Court "explicitly recognized the propriety of addressing the merits where doing so made it possible to avoid a doubtful issue of statutory jurisdiction." *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007) (Williams, J.). We reached the same conclusion about *Steel Co.* in *Sherrod v. Breitbart*, 720 F.3d 932, 399–400 (D.C. Cir. 2013).[4] Speaking for the court in a later case, Chief Judge Srinivasan thus stated: "The law of our circuit allows a court to

---

[4] *See also Lin v. United States*, 690 F. App'x 7, 9 (D.C. Cir. 2017); *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728 (D.C. Cir. 2008); *Thomas v. Network Sols., Inc.*, 176 F.3d 500 (D.C. Cir. 1999); *U.S. ex rel. Long v. SCS Bus. & Tech. Sols.*, 173 F.3d 890, 895–98 (D.C. Cir. 1999).

assume hypothetical statutory jurisdiction even if we cannot assume Article III jurisdiction." *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1246 (D.C. Cir. 2020).[5] These decisions are flatly contrary to Judge Katsas's argument. Despite his attempt to soften their impact, no panel has overruled *Kramer* or *Sherrod*, nor could it. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

## II.

This brings me to the final nail in my colleague's concurring opinion. As we have held and as the Supreme Court itself has recognized, *Steel Co.*'s priority-of-decision rule is limited to Article III jurisdiction.[6] Judge Katsas's argument that we must decide sovereign immunity before reaching the merits can be correct if and only if sovereign immunity is a matter of Article III jurisdiction. It clearly is not and the concurring opinion does not even attempt to show otherwise.

After the Supreme Court decided *Steel Co.*, our court was "uncertain" whether it covered federal sovereign immunity. *E. Bay Mun. Utility Dist. v. U.S. Dep't of Com.*, 142 F.3d 479, 482 (D.C. Cir. 1998). *In re Sealed Case No. 99-3091*, 192 F.3d 995 (D.C. Cir. 1999), settled the matter as far as our circuit law is concerned. Our court's ruling was clear and concise: "Given the

---

[5] This is also the law of other circuits. *See United States v. Woods*, 210 F.3d 70, 74 (1st Cir. 2000); *Butcher v. Wendt*, 975 F.3d 236, 244 (2d Cir. 2020); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 415 (3d Cir. 2003); *Montague v. NLRB*, 698 F.3d 307, 313 (6th Cir. 2012); *Lukowski v. INS*, 279 F.3d 644, 647 n. 1 (8th Cir. 2002); *Minesen v. McHugh*, 671 F.3d 1332, 1337 (Fed. Cir. 2012).

[6] Even with respect to Article III jurisdiction there are exceptions, as the court explained in *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 920 (D.C. Cir. 2013).

'quasi-jurisdictional or 'hybrid' status . . . of federal sovereign immunity, we are not required to decide that issue before the merits." *Id.* at 1000–01.[7]

And that tallies with the Supreme Court's repeated refusal to "mandate" an "order of decision that the lower courts must follow." *Pearson*, 555 U.S. at 241. Take qualified immunity, which "springs from the same root considerations that generated the doctrine of sovereign immunity." *Scheuer v. Rhodes*, 416 U.S. 232, 239 (1974). In that context, the Court has recognized that a "rigid" ordering rule risks "bad decisionmaking" and a "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case."

---

[7] Judge Katsas says that "five other circuits" — the First, Second, Third, Eighth, and Ninth — treat federal sovereign immunity as a "threshold jurisdictional issue." *Ante*, at 6 n.2. That would be news to them. *See, e.g.*, *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 157 (3d Cir. 2021) (deciding the merits and explaining that "we need not resolve" federal sovereign immunity); *Zarcon, Inc. v. NLRB*, 578 F.3d 892, 896 n.3 (8th Cir. 2009) (finding it "unnecessary . . . to address" federal sovereign immunity in light of merits ruling); *United States v. Manning*, 527 F.3d 828, 837 n.8 (9th Cir. 2008) ("Because the [statute] is invalid under the Supremacy Clause . . . we do not reach the issue of sovereign immunity[.]"); *Montijo-Reyes v. United States*, 436 F.3d 19, 23 (1st Cir. 2006) ("We do not need to decide" the sovereign-immunity issue. "Instead, we decide the case on the independent ground that there is an insufficient causal link between the alleged failure to comply . . . and the alleged harm."); *Smith v. Lehman*, 689 F.2d 342, 345 (2d Cir. 1982) ("This difficult sovereign immunity question need not be decided, however, because Smith's constitutional claims cannot succeed on the merits.").

In fact, every circuit — First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Federal — agrees with our court that it may exercise its discretion to bypass federal sovereign immunity and reach the merits. See the Addendum to this opinion.

6

III.

Against all this, Judge Katsas offers a single line from *FDIC v. Meyer*, 510 U.S. 471, 475 (1994): "Sovereign immunity is jurisdictional in nature[,]" so "we must first decide whether [the Federal Savings and Loan Insurance Corporation's] immunity has been waived."[8] In his view, this "holding" created a mandatory order of operations akin to that in *Steel Co. Ante*, at 9, 15–16.

The analogy to *Steel Co.* is telling — just not in the way Judge Katsas intends. In *Steel Co.*, the Court's thumbs-down to bypassing Article III questions spanned more than a dozen pages in the United States Reports and drew support from the text and structure of Article III, the "common understanding of what it takes to make a justiciable case," and a "long and venerable line" of precedent stretching back to 1804. *Steel Co.*, 523 U.S. at 94, 102. Compare that to *Meyer*. On Judge Katsas's reading, *Meyer* broke from centuries of common-law practice (without a whiff of historical analysis), announced a new constitutional rule (without citing the Constitution), and overruled stacks of Supreme Court cases (without a word on stare decisis) — all in a five-sentence umbrella paragraph.

A.

Judge Katsas begins his historical account of the common law in 1765, when Blackstone wrote that English subjects could

---

[8] "[T]he Supreme Court has warned against 'dissect[ing] the sentences of the United States Reports as though they were the United States Code.'" *Kalka v. Hawk*, 215 F.3d 90, 95 (D.C. Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). "So perhaps the statement about what the [Court] 'must' do describes only what [it] ordinarily should do." *Id.*

not sue the crown as they would an ordinary defendant.[9]  But that is only half the story.  In the thirteenth century, Bracton observed that "it was the king's duty to redress wrongs done by himself or on his behalf[.]" Ludwik Erlich, *Proceedings Against the Crown (1216 – 1377)* 43, in 6 Oxford Studies in Social and Legal History (Paul Vinograff, ed. 1921).  So from Edward I on, "the king himself [wa]s sued in the respectful form of a petition, and he never fail[ed] to comply with the judgment of his court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (Marshall, C.J.).  And by the fourteenth century, two new procedures — traverse and *monstrans de droit* — let subjects recover property without royal consent.  9 William Holdsworth, *A History of English Law* 25–26 (3d ed. 1944).  The short of the matter is this: "ordinary writs did not lie" against the king, *id.* at 10, but "sovereign immunity was not a bar to relief," Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 1 (1963).

Judge Katsas's sequencing rule is nowhere to be found in the common law. Take the *Bankers' Case* — the seminal eighteenth-century precedent on sovereign immunity.  The case arose when Charles II signed a secret treaty to help Louis XIV

---

[9] Judge Katsas also cites Vattel for the rule that sovereigns are exempt from foreign jurisdiction. *Ante*, at 13.  But this ignores the distinction between "domestic" and "foreign" sovereign immunity. As then-Professor Scalia explained, "the principles governing the amenability of a [sovereign] to suit before its own courts" are "not at all the same" as those "governing its amenability to suit before the courts of another sovereign." Antonin Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-lands Cases*, 68 Mich. L. Rev. 867, 886 (1970).  Federal sovereign immunity embodies the former; Vattel's rule and the Eleventh Amendment embody the latter.  *See id.*

defeat the Dutch. But wars are expensive, and Charles — "the playboy monarch" — was broke. Ronald Hutton, *Charles II* 446 (1989). So in 1671, he suspended payment on his debts, leaving London bankers in "ruin[,] . . . unable to pay their depositors." Holdsworth, *supra*, at 33. Then, after promising the bankers a royal annuity, Charles defaulted again in 1683. Seven years (and one Glorious Revolution) later, the bankers asked the Court of Exchequer to "enforce payment of these arrears." *The Case of the Bankers*, *in* 14 A Complete Collection of State Trials 3 (T.C. Howell ed., 1812) [hereinafter *Bankers' Case*].

The *Bankers' Case* raised two issues. The first was a merits question: whether the annuity was valid. The second concerned sovereign immunity. Bypassing the usual procedures, the bankers had sued in the Exchequer — the "court of revenue" with "power over the king's treasure." 3 William Blackstone, *Commentaries on the Laws of England* 428 (15th ed. 1809). With this novel tactic came a novel question: whether the court had "power to relieve the petitioners, and give judgment for them." *Bankers' Case* 7.

The barons of the Exchequer addressed the issues in precisely that order, holding for the bankers on both questions. *See id.* at 6–7. And when the attorney general appealed, a majority of the Exchequer Chamber affirmed. Consider Lord Chief Justice Holt's opinion. Like the barons, Holt began with the merits, finding the annuity "good and firm in law." *Id.* at 34. Only then did he reach the sovereign-immunity question, holding that the bankers' suit was "very proper and legal." After all: the bankers "ha[d] a right; and if so, then they must have some remedy to come at it too." *Id.*; *cf. Marbury*, 5 U.S. at 163. In Holt's view, the merits issue preceded — and informed — any discussion of power or relief. The House of Lords agreed with the Exchequer majority. *See Bankers' Case* 110.

B.

Judge Katsas suggests that his position is rooted in the Constitution.  Article III, section 2 states that the "judicial Power shall extend" to certain "Cases" and "Controversies."  It follows that "whether there is a case or controversy" is a "threshold matter."  *Steel Co.*, 523 U.S. at 92, 94.  Yet beyond these "large, round, indefinite terms," John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939, 2005 (2011), Article III dictates no rigid decisional sequence.

As to federal sovereign immunity, the Constitution says nothing.  Still less is there any hint about where it should fall in the courts' order of operations.  That is hardly surprising, for at the founding, "the federal government's immunity from suit was a question — not a settled constitutional fact."  Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 Geo. Wash. Int'l L. Rev. 521, 523 (2003).[10]

C.

---

[10] The Supreme Court first recognized federal sovereign immunity in 1821, when Chief Justice Marshall called it "[t]he universally received opinion[.]" *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 411 (1821).  As then-Judge Scalia quipped: "I cannot avoid noting . . . the profound envy that my colleague Judge Ginsburg and I have of Justice Marshall's ability to decide such an important issue in four words[.]"  Antonin Scalia, *Historical Anomalies in Administrative Law*, Y.B.: Sup. Ct. Hist. Soc'y 1985, 103, 105 (1985).

10

If the Constitution forbids courts from bypassing federal sovereign immunity, that "understanding" should "fill[] the United States Reports." *Ante*, at 15. But the opposite is true. From the nineteenth century onward, the Court often used its discretion to reach the merits ahead — or instead — of sovereign-immunity questions.

Take *Wilcox v. Jackson*, 38 U.S. 498 (1839). There, the Court ruled on the merits for a federal officer, without even mentioning sovereign immunity. *See also, e.g.*, *Brown v. Huger*, 62 U.S. 305 (1858) (same); *Grisar v. McDowell*, 73 U.S. 363 (1867) (same). And in *Lee v. United States*, 106 U.S. 196, 199 (1882), the Court "consider[ed] first" the merits, before saying a word about the immunity question. Tellingly, while *Lee* drew a spirited dissent, not one Justice suggested that the majority's sequencing choice offended the Constitution.

Of course, early courts also used their discretion to dismiss cases on sovereign-immunity grounds, without reaching the merits. And they often couched such dismissals in jurisdictional terms. *E.g.*, *United States v. McLemore*, 45 U.S. 286, 288 (1846). Still, no one suggested that Article III mandated that sequence — a point illustrated in *U.S. ex rel. Goldberg v. Meyer*, 37 App. D.C. 282 (1911), *aff'd sub nom*, *U.S. ex rel. Goldberg v. Daniels*, 231 U.S. 218 (1913). In *Goldberg*, our court ruled on the merits for the Secretary of the Navy, holding that a federal statute did not compel him to deliver a decommissioned cruiser to a would-be buyer. *Id.* at 288–89. Writing for the Court, Justice Holmes affirmed on the alternative ground of federal sovereign immunity. *See* 231 U.S. at 222. But he called this rationale "earlier in point of *logic*" — not constitutional priority — and he found "no sufficient reason for throwing doubt" on our merits-first approach. *Id.* at 221 (emphasis added). The upshot was clear. Decisional sequencing was a matter of discretion.

And that view held throughout the twentieth century. Consider *Kennedy v. Rabinowitz*, 318 F.2d 181 (D.C. Cir. 1963), *aff'd*, 376 U.S. 605 (1964) — a mirror image of *Goldberg*. In *Rabinowitz*, lawyers representing Cuba sued the Secretary of State, seeking a declaratory judgment that they were exempt from registering as foreign agents. Calling sovereign immunity a "threshold question," our court ordered the case "dismissed . . . as an unconsented suit against the United States." *Id.* at 182–83. But the Supreme Court saw things differently. In its view, the Foreign Agents Registration Act "plainly and unquestionably require[d] petitioners to register." 376 U.S. at 607. The Court thus affirmed on the merits, finding no "occasion to consider" sovereign immunity. *Id. See also, e.g.*, *Califano v. Boles*, 443 U.S. 282, 296–97 (1979) ("Because of our disposition of the [merits] issue, we need not and do not reach" federal sovereign immunity); *United States v. Mitchell*, 445 U.S. 535, 542 (1980) (deciding the merits and explaining that the Court "need not consider" federal sovereign immunity).

Did *Meyer* really discard all this precedent? Judge Katsas thinks so, observing — quite rightly — that none of these cases addressed the sequencing question head-on. *Ante*, at 17. But that is exactly the point. If two-hundred years elapsed before anyone supposed that the Constitution forbids courts to bypass federal sovereign immunity, that is a good sign that Sovereign Immunity First! is "bad wine of recent vintage." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring in judgment)).

\* \* \*

I acknowledge my colleague's prerogative to disagree with the precedents of the Supreme Court and of our court. Yet it

seems to me incumbent on my colleague to describe how he would replace the many precedents he disregards, precedents that make "theoretical sense" and "enormous practical sense." *Supra* n.3.

**ADDENDUM**

**First Circuit:**

*Montijo-Reyes v. United States*, 436 F.3d 19, 23 (1st Cir. 2006) ("We do not need to decide" the sovereign-immunity issue. "Instead, we decide the case on the independent ground that there is an insufficient causal link between the alleged failure to comply . . . and the alleged harm.").

*Scheidegg v. Dep't of Air Force*, 915 F.2d 1558 (Table), 1990 WL 151390, at *2 (1st Cir. Sept. 28, 1990) (per curiam joined by Breyer, J.) ("We bypass [federal sovereign immunity] because we can readily affirm the dismissal . . . on the merits.").

*Latinos Unidos de Chelsea en Accion (Lucha) v. Sec'y of Hous. & Urb. Dev.*, 799 F.2d 774, 793 & n.27 (1st Cir. 1986) (because "there is no private right of action," it is "unnecessary for us to consider whether sovereign immunity stands as a bar to plaintiffs' suit").

**Second Circuit:**

*Smith v. Lehman*, 689 F.2d 342, 345 (2d Cir. 1982) ("This difficult sovereign immunity question need not be decided, however, because Smith's constitutional claims cannot succeed on the merits.").

**Third Circuit:**

*Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 157 (3d Cir. 2021) ("[A]lthough we have not explicitly addressed whether the United States has waived sovereign immunity as to unjust enrichment claims, we need not resolve that issue here because Conboy and Gilsenan cited no record evidence creating a factual dispute material to their unjust enrichment claim against the SBA.").

*U.S. ex rel. IRS v. Norton*, 717 F.2d 767, 774 (3d Cir. 1983) ("[W]e find it unnecessary . . . to decide whether sovereign immunity bars the imposition of a criminal contempt sanction against the IRS" because "the IRS did not have fair warning that its retention of funds was a per se violation of the automatic stay.").

**Fourth Circuit:**

*Turner v. United States*, 736 F.3d 274, 280 n.2 (4th Cir. 2013) ("[W]e need not consider [sovereign immunity] because we find that the [Coast Guard] did not violate the relevant standard of care . . ..").

*Laber v. Harvey*, 438 F.3d 404, 423 & n.19 (4th Cir. 2006) (en banc) ("Title VII does not authorize a federal-sector employee to bring a civil action [of this sort]," so "we need not address the Army's sovereign immunity argument.").

*Al Fayed v. United States*, 210 F.3d 421, 423–25 (4th Cir. 2000) ("[T]he district court did not abuse its discretion" in declining "the issuance of a subpoena for highly classified government

documents[.]" So "we need not reach the Government's [sovereign-immunity] argument[.]").

*Littell v. Morton*, 445 F.2d 1207, 1210 (4th Cir. 1971) ("We consider first if the [statute] is applicable, because if it is not, manifestly, we need not consider the question of sovereign immunity.").

**Fifth Circuit:**

*Eberle v. Gonzales*, 240 F. App'x 622, 629 n.3 (5th Cir. 2007) ("Because we conclude that Eberle either failed to exhaust his administrative remedies or failed to establish a prima facie case of retaliation, we need not reach Defendants' alternative argument that the government has not waived sovereign immunity . . ..").

**Sixth Circuit:**

*Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 477 (6th Cir. 2006) ("[U]nder any circumstances in which the State (or the United States) declines to raise sovereign immunity as a threshold defense, we conclude that the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order they prefer.").

*Local 3-689, Oil, Chem. & Atomic Int'l Union v. Martin Marietta Energy Sys., Inc.*, 77 F.3d 131, 138 n.11 (6th Cir. 1996) ("[A]s it has already been decided that the requisite statutes do not imply private rights of action, this court need not reach whether the Energy Act waives sovereign immunity.").

**Seventh Circuit:**

*United States v. All Assets & Equip. of W. Side Bldg. Corp.*, 188 F.3d 440, 443 n.1 (7th Cir. 1999) ("Because the government did not directly appeal this issue, we need not reach this thorny question of sovereign immunity.").

*Merrill Tenant Council v. U.S. Dep't of Hous. & Urb. Dev.*, 638 F.2d 1086,1091 n.7 (7th Cir. 1981) ("Because a penalty clause is void in a contractual cause of action in Illinois, we do not reach the issue of whether the waiver of sovereign immunity extends to a penalty.").

**Eighth Circuit:**

*Zarcon, Inc. v. NLRB*, 578 F.3d 892, 896 & n.3 (8th Cir. 2009) ("[W]e reject Zarcon's argument that the OPEN Government Act should apply to this case[,]" so "it is unnecessary for us to address the NLRB's additional [sovereign-immunity] argument . . ..").

*Hartman v. Lyng*, 884 F.2d 1103, 1107 n.3 (8th Cir. 1989) ("[W]e need not, and therefore do not, rule on the sovereign immunity issue, given our conclusion that the district court did not err in declining to award damages.").

*United Handicapped Fed'n v. Andre*, 622 F.2d 342, 348 n.6 (8th Cir. 1980) ("We find that plaintiffs were not prevailing parties against federal defendants. Under the circumstances, we need not pass on the question of sovereign immunity.").

**Ninth Circuit:**

*Olsen v. U.S. ex rel. Fed. Crop Ins. Corp.*, 334 F. App'x 834, 835 n.1 (9th Cir. 2009) ("In light of our determination that the district court properly vacated the awards, we need not address whether the government waived its sovereign immunity.").

*Foti v. McHugh*, 247 F. App'x 899, 901 (9th Cir. 2007) ("Because the government's identification policy does not violate Appellants' constitutional rights, we need not address whether the district court properly dismissed . . . on the basis of sovereign immunity.").

*Castaneda v. U.S. Dep't of Agric.*, 807 F.2d 1478, 1479 n.3 (9th Cir. 1987) ("Because we affirm the dismissal of Castaneda's action on the merits, we need not resolve the dispute between the parties as to whether the doctrine of sovereign immunity bars his action against the USDA.").

*Lehner v. United States*, 685 F.2d 1187, 1190 (9th Cir. 1982) ("declin[ing] to decide" sovereign-immunity question where plaintiff "failed to allege facts which, if proven, would entitle her to relief").

**Tenth Circuit:**

*Watson v. United States*, 485 F.3d 1100, 1111 n.9 (10th Cir. 2007) (Gorsuch, J.) ("Because we affirm the district court's holding that the government was not negligent in its care of Mr. Lewis, we need not pass on . . . sovereign immunity[.]").

**Eleventh Circuit:**

*In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1255 n.7 (11th Cir. 2020) ("Because we hold for the [U.S. Small Business Administration] on the merits, we need not and do not reach the sovereign immunity issue.").

**Federal Circuit:**

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1358 (Fed. Cir. 2001); *cf. Energy Nw. v. United States*, 641 F.3d 1300, 1311 n.6 (Fed. Cir. 2011) (explaining that *Bluebonnett* "rejected [the plaintiffs'] claim for inadequate proof" and "did not take up the sovereign immunity question").